**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JIMMY EARL HILTON, JR.,

*Defendant-Appellant.*

No. 11-4273

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TAMATHA MICHELE MONEY HILTON,

*Defendant-Appellant.*

No. 11-4298

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JACQUELINE H. HILTON

*Defendant-Appellant.*

No. 11-4743

Appeals from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(5:10-cr-00002-RLV-DSC-2; 5:10-cr-00002-RLV-DSC-1;
5:10-cr-00002-RLV-DSC-3)

Argued: October 24, 2012

Decided: December 13, 2012

Before TRAXLER, Chief Judge, KEENAN, Circuit Judge, and R. Bryan HARWELL, United States District Judge for the District of South Carolina, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Judge Harwell joined.

---

**COUNSEL**

**ARGUED:** Rudolph Alexander Ashton, III, MCCOTTER, ASHTON & SMITH, PA, New Bern, North Carolina; Daniel Baker McIntyre, III, Charlotte, North Carolina; Lawrence W. Hewitt, GUTHRIE DAVIS HENDERSON & STATON, Charlotte, North Carolina, for Appellants. Michael E. Savage, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Anne M. Tompkins, United States Attorney, Benjamin Bain-Creed, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

**OPINION**

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, Jacqueline, Tamatha, and Jimmy Hilton (collectively, the defendants) challenge their convictions on charges involving a scheme to defraud The Woodsmiths

Company (Woodsmiths, or the company), a small North Carolina furniture manufacturer that was Tamatha Hilton's employer. The primary issue before us is whether the statutes prohibiting identity theft and aggravated identity theft, 18 U.S.C. §§ 1028(a)(7) and 1028A, under which Jimmy Hilton and Jacqueline Hilton were convicted, encompass the theft of the identity of a corporation. We hold that these statutes are fatally ambiguous in this respect, and we vacate the convictions of Jimmy Hilton and Jacqueline Hilton on these counts. We conclude that the defendants' other arguments are without merit. Accordingly, we affirm Tamatha Hilton's convictions. We also affirm the remaining convictions of Jimmy Hilton and Jacqueline Hilton, but vacate the sentences imposed and remand those convictions to the district court for resentencing.

I.

The charges in this case arose from a two-year scheme in which the defendants defrauded Woodsmiths of about $655,000, by stealing and cashing numerous checks written to Woodsmiths by its customers. Tamatha Hilton (Tamatha) was Woodsmiths' office manager and bookkeeper. As part of her duties, Tamatha possessed the only keys to Woodsmiths' post office box and was responsible for retrieving the company mail.[1] Tamatha participated in the fraud by sending company invoices to customers, requesting that they mail either initial or final payment for their furniture orders to the company address. When the checks arrived at the company's post office box, Tamatha removed the checks and, instead of depositing them into the company's bank account, gave them to her husband and co-defendant, Jimmy Hilton (Jimmy). During the course of the scheme, Tamatha stole approximately 168 checks in the aggregate amount of about $655,000.

---

[1]All mail addressed to Woodsmiths' physical address was rerouted by the Postal Service to the post office box.

In January 2007, before the charged thefts began, defendant Jacqueline Hilton (Jacqueline), Jimmy's former wife, opened a bank account at SunTrust Bank in her name (the bank account, or the SunTrust account), falsely purporting to be the owner of a business called Woodsmiths Furniture Company. The managers of the true entity, Woodsmiths, had no knowledge of Jacqueline's actions. Jacqueline also purchased a custom, pre-printed stamp at an office supply store bearing the words:

> Pay to the order of Suntrust Bank 053100465. For deposit only Woodsmiths 1000036388063.

Jacqueline testified that she opened the bank account at Jimmy's request, and was paid one thousand dollars per month for maintaining the account.

To effectuate the fraud, Jimmy endorsed the stolen checks with the pre-printed stamp and completed corresponding deposit slips, while Jacqueline deposited the checks into the bank account. Other than the initial deposit of $150 required to open the account, the only deposits made to the SunTrust account were the 168 checks taken from Woodsmiths' post office box.

During the course of the fraud, Jacqueline and Jimmy wrote, and Jacqueline signed, more than 200 checks drawn on the account. Law enforcement officers traced the withdrawn funds to the defendants, including nearly $250,000 in cash withdrawals obtained by Jimmy and Jacqueline, as well as payments made to various businesses owned and operated by Jimmy. The withdrawn funds also were used to make mortgage payments on the home that Jimmy and Tamatha owned.

To conceal the fraud, Tamatha sent customers falsified invoices indicating that their checks had been credited to their furniture orders, when in fact the checks had been stolen and deposited in the SunTrust account. Tamatha also altered the

company's accounting records, and provided misleading information to her supervisors when questioned about accounting discrepancies.

As Woodsmiths continued to lose money from the thefts, the company attempted to collect what appeared to be outstanding balances for furniture that already had been shipped. The owner of Woodsmiths discovered the fraud when a customer produced a copy of a cancelled check, which had been sent as payment for a furniture order but was intercepted and deposited into the SunTrust account. In early 2008, as a result of the financial loss stemming from the fraud, Woodsmiths "laid off" all its employees. At the time of trial, Woodsmiths' owner was the company's only full-time employee, and he was able to hire workers only on a week-to-week basis for limited hours of work.

The defendants ultimately were charged in a forty-three count indictment on charges including identity theft, mail fraud, mail theft, money laundering, conspiracy, passing forged securities, and making a false statement to a financial institution. After a six-day trial, a jury acquitted Jacqueline of making a false statement to a financial institution but convicted the defendants on all remaining counts. The district court sentenced Tamatha to a total term of 65 months' imprisonment; Jimmy to a total term of 120 months' imprisonment; and Jacqueline to a total term of 81 months' imprisonment. Each defendant also was sentenced to a period of supervised release and ordered to pay restitution in the amount of $655,876.04. All three defendants filed a timely notice of appeal.

## II.

We first address the district court's denial of two pre-trial motions: (1) Tamatha's motion to suppress certain statements she made to law enforcement officers; and (2) Jimmy's motion for leave to represent himself during jury selection.

We review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (motion to suppress); *United States v. Bush*, 404 F.3d 263, 270 (4th Cir. 2005) (motion for self-representation).

A.

Tamatha challenges the district court's denial of her motion to suppress her post-arrest statements, asserting that she was denied access to an attorney during questioning despite her repeated requests. When a district court has denied a motion to suppress, we view the evidence in the light most favorable to the government. *Branch*, 537 F.3d at 337. At the suppression hearing, the district court heard testimony from Tamatha and two law enforcement agents who questioned her following her arrest, Postal Inspector Mark Heath and Secret Service Special Agent Jonathan Shelton (collectively, the officers).

The evidence showed that at the beginning of her interview with the officers, Tamatha signed the Postal Inspection Service's Warning and Waiver of Rights form. Tamatha testified that the officers did not recite the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966), that she did not read or understand the warning and waiver form, and that she requested an attorney at least nine times while being transported from her home to the Postal Inspection office. She also stated that she asked to consult with an attorney several additional times while being interviewed at the Postal Inspection office.

Inspector Heath disputed Tamatha's version of the events, testifying that he orally advised Tamatha of her *Miranda* rights at the beginning of the interview. In addition, both officers denied that Tamatha made any of the claimed requests for an attorney. The officers testified that Tamatha made only one request for an attorney, when she was asked to give a

written statement at the end of the interview, and that the officers honored her request.

After evaluating the credibility of the witnesses, the district court denied Tamatha's motion to suppress, finding that the only time she clearly and unequivocally invoked her right to counsel was at the end of the interview when asked to give a written statement. The court further found that the officers honored Tamatha's request for counsel, and that her statement was voluntary.

In reviewing the denial of a motion to suppress, we accord particular deference to a district court's credibility determinations. *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008). This deference is based on the district court's role of observing the witnesses and of weighing their credibility. *Id.* (citation omitted). In the present case, Tamatha merely disputes the district court's credibility findings, and argues that she requested an attorney at various times during her interrogation. Because the district court was faced with directly contradictory evidence regarding this issue, the court was required to determine which testimony accurately reflected the events that transpired. We hold that, in discharging this duty, the district court did not clearly err in crediting the officers' testimony, rather than Tamatha's version of the events.

B.

Jimmy challenges the district court's denial of his motion for leave to represent himself at the jury selection stage of his trial. The record shows that on the morning of jury selection, Jimmy asked that he be permitted to proceed pro se, after having been represented by court-appointed counsel for eight months. The district court found that the motion was untimely and proceeded with the jury selection process, during which Jimmy was represented by his longstanding counsel. After the jury was selected, the court informed Jimmy that he would be allowed to represent himself at the trial scheduled to begin 20

days later, with the federal defender serving as stand-by counsel.

In considering Jimmy's claim, we first observe that a defendant's right to self-representation is a protection afforded by the Sixth Amendment. *Faretta v. California*, 422 U.S. 806 (1975); *United States v. Singleton*, 107 F.3d 1091, 1095-96 (4th Cir. 1997). This right extends to participation in the voir dire process. *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984). A request for self-representation must be "(1) clear and unequivocal; (2) knowing, intelligent, and voluntary; and (3) timely." *United States v. Frazier-El*, 204 F.3d 553, 558 (4th Cir. 2000) (citations omitted). Such a request generally must be asserted before "meaningful trial proceedings" have begun. *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979). Thereafter, a defendant's request for self-representation is a matter submitted to the sound discretion of the trial court. *Id.* We have emphasized that the right to self-representation is not "to be used as a tactic for delay; for disruption; for distortion of the system; or for manipulation of the trial process." *Frazier-El*, 204 F.3d at 560 (citations omitted); *see also Singleton*, 107 F.3d at 1096 (in the case of an untimely request, a defendant's exercise of his right to proceed pro se "may be denied, limited, or conditioned").

In the present case, the district court found that Jimmy's request for self-representation during the jury selection process was untimely, and "was a tactic for unnecessarily delaying the court proceedings." The court noted that jury selection had been scheduled for over a month, and that Jimmy had been represented by the same attorney for eight months. The court emphasized that because jury selection for Jimmy's two co-defendants was scheduled to begin, an accommodation of Jimmy's request "would have inconvenienced these other parties, inconvenienced the members of the jury venire, and disrupted jury selection in the other case." Additionally, the court found that due to the complex nature of the discovery materials, a decision allowing Jimmy to represent himself at this

stage would require a continuance of the jury selection proceedings.

Most importantly, the district court found that Jimmy's "request for self-representation was motivated by the desire to improperly delay the trial proceedings," in light of the "specious" justification Jimmy had offered and the fact that his request "was accompanied by an attempt to serve frivolous papers on the [c]ourt and the other parties present." Thus, exercising its discretionary authority at this early stage of the trial, the court denied this aspect of Jimmy's request. However, the court permitted Jimmy to proceed pro se at trial because that request did not present issues of improper delay or disruption of the proceedings. After reviewing the record, we conclude that the district court's factual findings were not clearly erroneous and provided a sufficient basis for the court's discretionary determination denying Jimmy's request for self-representation during the jury selection proceedings.[2]

### III.

We turn now to consider the defendants' various challenges concerning their convictions for identity theft, aggravated identity theft, mail theft, and mail fraud.

---

[2]Relying on *McKaskle*, 465 U.S. 168, Jimmy also appears to argue that he was denied his right to proceed pro se not only at jury selection, but also at trial, because his counsel's involvement in jury selection "destroyed the jury's perception that Jimmy Hilton was representing himself." The decision in *McKaskle*, however, addressed the role of stand-by counsel at trial, and Jimmy does not argue that his stand-by attorney acted improperly. Moreover, the jury was instructed at the outset of the trial that Jimmy was representing himself and that counsel would be acting only in a stand-by capacity. Accordingly, to the extent Jimmy maintains that his right to self-representation was infringed during the presentation of witnesses and argument to the jury, based on counsel's earlier participation during the jury selection proceedings, we reject that contention.

A.

Jimmy and Jacqueline appeal their convictions for identity theft and aggravated identity theft, in violation of 18 U.S.C. §§ 1028(a)(7) and 1028A (the identity theft statutes). They argue that the conduct charged, namely, the use of the stamp bearing Woodsmiths' name in endorsing the stolen checks, did not constitute a violation of the identity theft statutes, because the language of those statutes does not encompass the act of stealing the identity of a corporation. In particular, these defendants observe that the statutory language refers only to use of a means of identification of another "person," and that such "means of identification" are defined only with reference to the identification of a "specific individual." Therefore, they contend that the class of protected victims identified in the identity theft statutes is limited to natural persons and, accordingly, the identity theft convictions should be vacated.

In response, the government contends that corporations are included within the class of protected victims, because the statutes' purposes are served equally by protecting corporations and individuals from identity theft. The government further maintains that because the consequences of identity theft may be devastating to corporations, as evidenced by the facts in this case, it is reasonable to conclude that Congress intended to protect corporate victims, in addition to natural persons. We disagree with the government's arguments.

This issue presents a question of statutory interpretation, which we review de novo, *United States v. Mitchell*, 518 F.3d 230, 233 (4th Cir. 2008), mindful of the special considerations governing the interpretation of criminal statutes. *See United States v. Childress*, 104 F.3d 47, 51 (4th Cir. 1996) (quoting *United States v. Sheek*, 990 F.2d 150, 152-53 (4th Cir. 1993)). Criminal statutes "are to be strictly construed and should not be interpreted to extend criminal liability beyond that which Congress has 'plainly and unmistakenly' proscribed." *Id.* at 51-52 (citation omitted).

In light of the serious consequences flowing from a criminal conviction, the rule of strict construction rests on the principle that "no [person] shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265-66 (1997) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). Accordingly, although "[t]he simple existence of some statutory ambiguity is not sufficient" to trigger automatic resolution of the ambiguity in favor of a defendant, *United States v. Helem*, 186 F.3d 449, 455 (4th Cir. 1999) (quoting *Muscarello v. United States*, 524 U.S. 125, 138 (1998)), "we will construe [a] criminal statute strictly and avoid interpretations not clearly warranted by the text." *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (citation and internal quotation marks omitted).

The first identity theft statute before us, 18 U.S.C. § 1028(a)(7), prohibits the knowing transfer, possession, or use, without lawful authority, of "a means of identification *of another person* with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of [f]ederal law, or that constitutes a felony under any applicable [s]tate or local law." *Id.* (emphasis added). The second identity theft statute that we consider, 18 U.S.C. § 1028A, proscribes the same conduct in connection with certain enumerated felonies, including mail fraud, and provides for enhanced penalties.

Although the substantive prohibitions of both statutes apply to the identity of "person[s]," the term "means of identification" found in both statutes is defined in § 1028(d)(7)[3] as "any name or number that may be used, alone or in conjunction with any other information, *to identify a specific individual*"

---

[3]This definition applies to offenses charged under § 1028A as well as § 1028(a). *See* 18 U.S.C. § 1028(d); *Mitchell*, 518 F.3d at 234.

(emphasis added).[4] Thus, we must determine whether the phrase "means of identification of another *person*," as used in the identity theft statutes, encompasses the unauthorized use of the identification of corporations, when the term "means of identification" is defined by statute as referring to the identity of "specific *individual[s]*."

The identity theft statutes do not define the terms "person" or "individual." However, the Dictionary Act, 1 U.S.C. § 1, which defines terms used in the United States Code "unless the context indicates otherwise," specifies that the word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." Accordingly, under the Dictionary Act, corporations generally are considered "persons" when a statute fails to indicate otherwise. However, the Dictionary Act does not define the word "individual."

The Dictionary Act further complicates this inquiry by treating the word "individual" as a subset of the term "person." By making this distinction with regard to these two words, the Dictionary Act suggests that the two words are not synonymous. Thus, aware of the general definitions contained in the Dictionary Act, Congress drafted the identity theft statutes by using the term "person," which includes corporations,

---

[4]Section § 1028(d)(7) enumerates a non-exhaustive list of means of identification, including:

> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

> (C) unique electronic identification number, address, or routing code; or

> (D) telecommunication identifying information or access device (as defined in section 1029(e)).

but also by using the word "individual," which may or may not include corporations.

The context of the identity theft statutes does not indicate whether the term "individual" includes corporations. Although some of the examples of "means of identification" enumerated in § 1028(d)(7), such as employer and tax identification numbers, could apply to corporations, this fact does not resolve the ambiguity in the statute because all the listed means of identification could apply to natural persons as well as to corporations.[5]

We recognize that the identity theft statutes have been interpreted broadly in other contexts to protect victims and to deter such thefts. *See, e.g.*, *United States v. Maciel-Alcala*, 612 F.3d 1092, 1100 (9th Cir. 2010) (interpreting the term "person" in § 1028A to include both living and deceased persons). And, although the effects of identity theft may be financially devastating to corporations, we cannot discern any evidence from the text of the statute indicating that Congress intended to protect corporate victims as well as natural persons.

In light of the statutory ambiguity resulting from Congress' use of both the term "individual" and the term "person" when referring to victims of identity theft, and in the absence of any

---

[5]In urging a contrary conclusion, the government cites *Clinton v. City of New York*, 524 U.S. 417 (1998), in which the Supreme Court held that the term "individual," as employed in the Line Item Veto Act, Pub. L. No. 104-130, 110 Stat. 1200 (1996), included corporations. The statute allowed "any Member of Congress or any individual adversely affected" by the Act to seek judicial review for the purpose of challenging the constitutionality of the Act. *Clinton*, 524 U.S. at 428. The Court held that it could discern no rational reason why Congress would have authorized judicial actions brought by natural persons affected by the statute but preclude such actions brought by corporations. *Id.* at 428-29. However, because the Court addressed in *Clinton* the requirements for bringing suit under a civil statute, the Court's conclusion is not relevant to our current inquiry given our duty to construe criminal statutes strictly.

particular context illuminating the use of these terms in the statutes, we are left to speculate regarding the class of victims that Congress intended to protect. In such a circumstance, the rule of lenity requires that, "[w]hen a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *WEC Carolina Energy Solutions*, 687 F.3d at 206 (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952)) (alterations omitted).

The rule of lenity is based on two substantial considerations. First, the rule recognizes that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 535 (4th Cir. 2005) (quoting *Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687, 704 n.18 (1995)). Second, the rule acknowledges that Congress, rather than the judiciary, is the proper institution to define criminal conduct. *Id.*

Here, nothing in the text, structure, articulated purpose, or legislative history[6] of the identity theft statutes compels the

---

[6]We note that the legislative history of § 1028A provides no support for the conclusion that Congress intended to protect corporations from identity theft. The language used in the House Judiciary Committee Report exclusively suggests that the identity theft statutes were intended to protect natural persons. For example, one congressman commented that "[i]dentity crime is not directed at one demographic. It affects all types of *individuals*, regardless of age, gender, nationality or race," and went on to explain that Congress "must find new ways to protect *consumers* from the compromise of their *personal information*." H.R. Rep. No. 108-528, 2004 WL 5685676, at *788 (2004) (emphasis added) (statement of Rep. Coble, Chairman, H. Subcomm. on Crime, Terrorism, and Homeland Sec.); *see also id.* at *792-93 (statement of Rep. Schiff) (explaining that "[i]dentity theft occurs when *an individual's personal information* is stolen and then used fraudulently for economic gain" and that "[a] victim of identity theft

conclusion that Congress intended to make the theft of a corporation's identity a crime under §§ 1028(a)(7) or 1028A.[7] Accordingly, we are left with a "grievous ambiguity or uncertainty in the statute[s]," and we decline to speculate regarding Congress' intent. *Barber v. Thomas*, 130 S. Ct. 2499, 2508 (2010) (quoting *Muscarello*, 524 U.S. at 139). Instead, faced with the choice of two plausibly valid interpretations, "we yield to the rule of lenity." *WEC Carolina Energy Solutions*, 687 F.3d at 205-06.

We conclude that the identity theft statutes are fatally ambiguous regarding whether they include as a criminal offense the unauthorized use of the means of identification of a corporation. For these reasons, we vacate Jimmy's and Jacqueline's convictions for identity theft and aggravated identity theft.

usually spends a year and a half working to restore *his or her identity and good name*") (emphasis added). In contrast to this language suggesting Congressional intent to protect natural persons, we note the lack of similar statements concerning corporations in reaching our conclusion of ambiguity.

We also observe that the terms "individual" and "person" are used interchangeably and imprecisely in the House Judiciary Committee Report, further supporting our finding of ambiguity in the statutes themselves. *See* H.R. Rep. No. 108-528, 2004 WL 5685676, at *786 (using the phrase "means of identification of *another individual*," in reference to the identity theft statutes, and in the next sentence referring to "another *person's* means of identification") (emphasis added).

[7]Jimmy and Jacqueline rely on *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), in support of their position that the identity theft statutes do not apply to theft of a corporate identity. This reliance is misplaced. The Court in *Flores-Figueroa* addressed the issue whether, to be convicted under § 1028A, a defendant must know that the stolen identification at issue belonged to an actual person, as opposed to a fictitious identity. 556 U.S. at 648. The Court concluded that such knowledge is required, *id.* at 647, but did not consider whether the identity theft statutes apply to corporate identities.

B.

Tamatha and Jimmy contest the sufficiency of the evidence to support their convictions for mail theft, in violation of 18 U.S.C. § 1708 (the mail theft statute). They argue that the thefts of Woodsmiths' checks were not within the purview of the mail theft statute, because Tamatha's position as office manager and bookkeeper included the authority to open Woodsmiths' post office box and remove all mail from it. Thus, according to these defendants, Tamatha lawfully removed the letters containing customers' checks from Woodsmiths' post office box and later committed the common law offense of larceny or embezzlement, but did not violate the federal mail theft statute. We find no merit in this argument.

We review the district court's denial of a motion for judgment of acquittal de novo. *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011). In reviewing the sufficiency of the evidence supporting a conviction, we consider the evidence in the light most favorable to the government and "will sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Id.* (emphasis in original).

The mail theft statute, 18 U.S.C. § 1708, provides in relevant part:

> *Whoever steals, takes, or abstracts, or by fraud or deception obtains, or attempts so to obtain, from or out of any mail, post office, or station thereof*, letter box, mail receptacle, or any mail route or other authorized depository for mail matter, or from a letter or mail carrier, *any letter, postal card, package, bag, or mail*, or abstracts or removes from any such letter, package, bag, or mail, any article or thing contained therein, or secretes, embezzles, or destroys any such letter, postal card, package, bag, or mail, or

any article or thing contained therein . . . (emphasis added).

The mail theft statute does not encompass thefts that occur after a letter has left the custody of the postal service, in this case, the post office. *See United States v. Patterson*, 664 F.2d 1346, 1347-48 (9th Cir. 1982); *United States v. Logwood*, 360 F.2d 905, 907-08 (7th Cir. 1966). Accordingly, to meet this statutory requirement, the government was required to prove that the defendants had the intent to steal at the time Tamatha removed the mail from the postal facility. *See United States v. Lampson*, 627 F.2d 62, 66 (7th Cir. 1980); *see also Allen v. United States*, 387 F.2d 641, 643 (5th Cir. 1968) (the fact that "[a letter] was stolen is not sufficient; the proof must show that it was stolen from the mails").

The evidence at trial showed that Tamatha had the intent to steal at the time she removed the checks from the mailbox, because the fraudulent scheme already was in place. The Sun-Trust bank account was opened by Jacqueline on January 23, 2007, and the first stolen check was deposited the very next day. The extended time period during which the conspiracy was conducted further illustrates Tamatha's and Jimmy's pre-existing intent to steal. The checks were deposited over a two-year period, demonstrating a pattern of conduct that negated any possible inference of mistake or misapprehension of authority.

The jury was instructed that, to convict the defendants of mail theft, the required intent to steal must have existed "at the time the mail [was] taken or obtained from the mailbox, post office or authorized depository for mail matter." Accordingly, by finding Tamatha and Jimmy guilty of mail theft, the jury found that they had an intent to steal the checks when Tamatha removed the mail from the post office.

The fact that Tamatha was authorized to remove mail from Woodsmiths' mailbox does not alter our analysis. Although

Tamatha's supervisor had given her the authority to collect Woodsmiths' mail, this authority did not extend to removal of the mail for the purpose of converting it for her own benefit. Under established principles of agency law, the scope of an agent's authority is not unlimited and does not extend to actions that harm the interests of the principal. *Cf. In re Am. Biomaterials Corp.*, 954 F.2d 919, 924-25 (3d Cir. 1992) (noting that an employee who embezzles from his corporation does not act within the scope of his employment in doing so). Thus, an act of a servant is not within the scope of employment if it is "within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07(2) (2006).

In the present case, the evidence established that Tamatha's supervisors had not given Tamatha the authority to remove customer checks from the company's post office box and to convert them for her own benefit. As the office manager and bookkeeper, Tamatha was authorized to collect Woodsmiths' mail from the company post office box, enter customer checks into the accounting system, and deposit the checks into Woodsmiths' BB&T bank account. Michael Munoz, the owner of Woodsmiths, testified that Tamatha's authority regarding customer checks was limited to that particular bank account.[8] Munoz also testified that, contrary to one of the defense theories at trial, Woodsmiths' management did not permit checks written by customers to be endorsed and given directly to a Woodsmiths vendor for payment; rather, any such payments to vendors were required to be recorded in the company accounting system.[9]

---

[8]Munoz elaborated that he did not authorize anyone to take from Woodsmiths the 168 checks in question or to deposit them into the SunTrust account.

[9]Jimmy's theory at trial, consistent with the statement Tamatha gave to the officers following her arrest, was that Tamatha had given him the checks as payment for certain contract work he had done for Woodsmiths.

The evidence further showed that Tamatha acted directly contrary to her employer's interests at the time she removed each of the checks from Woodsmiths' post office box. As discussed above, the prior planning of the fraudulent scheme and its lengthy duration unquestionably support the conclusion that she intended to defraud her employer in a systematic fashion over a period of multiple years. Indeed, despite being confronted with evidence that the fraud was causing Woodsmiths severe financial hardship, Tamatha falsified customer invoices, altered Woodsmiths' accounting records, and lied to her supervisors to disguise and continue perpetration of the fraud.

As demonstrated by this evidence, Tamatha acted outside the scope of the authority granted to her by her employer when she removed Woodsmiths' checks from the company's post office box and, rather than entering the checks into the accounting system and depositing them into the company's bank account, retained the checks for the benefit of herself and her co-defendants. Therefore, we conclude that the evidence supported the jury verdict on the counts of mail theft brought under 18 U.S.C. § 1708.

## C.

Jimmy, Tamatha, and Jacqueline challenge the sufficiency of the evidence to support their convictions for mail fraud affecting a financial institution, in violation of 18 U.S.C. § 1341.[10] The defendants contend that their use of the mail was only tangential to, rather than "for the purpose of executing," the fraudulent scheme as required by § 1341. Alterna-

---

[10]In Counts 12 through 19, the indictment alleges that the three defendants, "aided and abetted by each other and persons known and unknown to the grand jury, having devised the scheme and artifice to defraud and to obtain money and property from The Woodsmiths Company . . . did take and cause to be taken," fraudulently endorse, and deposit into the SunTrust bank account eight named checks, in violation of 18 U.S.C. §§ 2 and 1341.

tively, they argue that the mails were not used in furtherance of the fraud, because Tamatha's actions in mailing invoices and receiving payment from Woodsmiths' customers were functions authorized and required by her employer as a duty of her employment.

In reviewing the district court's denial of the defendants' motions for judgment of acquittal, we consider whether the jury reasonably could have concluded that the mailings were for the purpose of executing the fraudulent scheme, viewing the evidence in the light most favorable to the government. *United States v. Snowden*, 770 F.2d 393, 397 (4th Cir. 1985). The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . *for the purpose of executing such scheme or artifice* or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both (emphasis added).

The statutory requirement that the mails be used "for the purpose of executing" the fraud does not require that use of the mails be "an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989). Rather, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Id.* at 710-11 (citations, alterations, and internal quotation marks omitted). A person

causes the use of the mails when he "does an act with knowl-edge that the use of the mails will follow in the ordinary course of business." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).

The Supreme Court clarified the nature of this required mailing nexus in *Parr v. United States*, 363 U.S. 370 (1960), in which the Court addressed a scheme devised by school dis-trict and banking officials to defraud the school district of tax-payer funds. As part of the scheme, one of the defendants misappropriated tax payments mailed to the school district office. The government claimed that the mailing nexus was satisfied by the district's mailing of tax statements and related documents to taxpayers, which mailings were required by state law. *Id.* at 382, 385.

The Court rejected the argument that "mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing for the District plan to steal, when or after received, some indefinite part of its moneys." *Id.* at 391. However, the Court expressly declined to comment whether its reasoning would extend to "the conduct of a doctor's sec-retary or a business concern's billing clerk or cashier in mail-ing out, in the course of duty, the employer's lawful statements with the design, eventually executed, of misappro-priating part of the receipts."[11] *Id.* at 386.

_____

[11]In addition to the tax statement scheme, the Supreme Court rejected another claimed mailing nexus in *Parr*, whereby the defendants fraudu-lently used the school district's credit card to obtain gasoline products, knowing that the gasoline company would use the mails to send the credit card bills to the district. 363 U.S. at 392. The Court found that this connec-tion between the fraud and the mails was insufficient because it was immaterial to the defendants, "or to any consummation of the scheme," how the gasoline company sought payment. *Id.* at 393.

Although the defendants seek to apply this reasoning to their scheme, we are not persuaded by their attempted analogy. Contrary to defendants'

More recently, in *Schmuck*, the Court explained that the existence of a legal duty to use the mails was the gravamen of the holding in *Parr* that such use did not constitute mail fraud, because the defendants in *Parr* would have made those required mailings irrespective of the fraudulent scheme. 489 U.S. at 713 n.7. In its analysis in *Schmuck*, the Court addressed a scheme in which the defendant, a seller of used cars, lowered the odometer readings on used cars and sold them to retail car dealers, who in turn sold the cars to customers for inflated prices reflecting the lowered odometer readings. 489 U.S. at 707. The Court held that the mailing nexus was satisfied for purposes of the mail fraud statute, because the retail dealers mailed a required title application form to the state department of transportation to complete the transactions, thereby enabling the fraud to be consummated. *Id.* at 707, 711-12; *see also United States v. Woods*, 535 F.2d 255, 256-57 (4th Cir. 1974) (holding that the mailing nexus was satisfied when, "as an integral part of their scheme to defraud," the defendants submitted fraudulent credit card applications and the credit cards were sent to them through the mails, and concluding that the "scheme did not reach fruition . . . until after the cards had been acquired and used by the defendants"). The Court also rejected the defendant's contention that "routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense." *Schmuck*, 489 U.S. at 714-15.

The mailing nexus issue before us is resolved by the Court's analysis in *Schmuck*. The evidence presented at trial amply established that use of the mail was at least "incident to an essential part of the scheme, or a step in the plot," if not "an essential element of the scheme." *Schmuck*, 489 U.S. at 710-11 (citations omitted). The connection to the mails is con-

---

contention that "it was immaterial to Defendants how The Woodsmith [sic] Company went about collecting its payment," in fact, as discussed below, Tamatha would not have had access to Woodsmiths' funds had customers not sent the checks through the mail.

siderably more substantial here than the connection in *Schmuck*, given that Tamatha herself sent the invoices which prompted Woodsmiths' customers to mail the checks, and she ultimately stole the checks directly from the company's post office box. Although Tamatha sent Woodsmiths' customers invoices as part of her official duties as office manager, neither the invoices nor the resulting customer checks were sent through the mails as a result of a duty imposed by law.

The evidence further demonstrated that Tamatha caused the checks to be mailed as a step in executing the fraud, because this procedure was the only means by which she could have obtained access to Woodsmiths' funds. Had the funds instead been wired directly to Woodsmiths' bank account, Tamatha would not have had access to those funds because she was not a signatory on the account. The evidence also indicated that Tamatha sent falsified invoices to customers in order to conceal the fraud. This body of evidence supports the conclusion that Tamatha's actions causing the checks to be mailed were "part of the execution of the scheme as conceived by the perpetrator[s] at the time." *Schmuck*, 489 U.S. at 715. When we view this evidence in the light most favorable to the government, we hold that the jury reasonably could have concluded that Tamatha, aided and abetted by Jimmy and Jacqueline, used the mails for the purpose of executing the fraud at the time she caused the checks to be mailed.

## IV.

In sum, we affirm Tamatha's convictions. We reverse Jimmy's and Jacqueline's convictions for identity theft and aggravated identity theft, because the language of those statutes is fatally ambiguous regarding whether corporate victims are within the class of protected victims. We affirm Jimmy's and Jacqueline's convictions on all remaining charges, and remand those convictions to the district court for resentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*