**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-4339**

———————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHRISTOPHER WILLIAM KUEHNER, a/k/a nechris, a/k/a William Christopher Kuehner,

Defendant – Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:22-cr-00120-LMB-4)

———————

Argued:  September 27, 2024                                      Decided:  January 16, 2025

———————

Before GREGORY, QUATTLEBAUM, and BERNER, Circuit Judges.

———————

Affirmed by published opinion.  Judge Berner wrote the opinion in which Judge Gregory and Judge Quattlebaum joined.

———————

**ARGUED:** Lana Manitta, LAW OFFICE OF LANA MANITTA, PLLC, Alexandria, Virginia, for Appellant.  Seth Michael Schlessinger, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Jessica D. Aber, United States Attorney, Richmond, Virginia, Daniel Honold, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————

BERNER, Circuit Judge:

More than forty years ago in *New York v. Ferber*, the United States Supreme Court expressed profound concern about the rise of child exploitation and abuse through the production and dissemination of photographs and films depicting minors engaging in sexual activity. 458 U.S. 747, 749 (1982). The Court emphasized that the "prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Id.* at 757. This is because such photographs and films become "a permanent record" of the abuse of a child "and the harm to the child is exacerbated by their circulation." *Id.* at 759. *Ferber* was decided long before the advent of the Internet and social media, digital cameras, video cameras, and cell phones at the ready, and relatively inexpensive computer equipment. Taken together, these technological advances have enabled an exponential increase in the instantaneous, often anonymous, and broad dissemination of such material.

Congress recognized this growing problem when, in 2006, it enacted the Adam Walsh Child Protection and Safety Act to protect children from sexual exploitation and abuse, by promoting Internet safety and preventing the production and dissemination of child pornography, which we will refer to as child sexual abuse material.[1] Adam Walsh

---

[1] "Child pornography" is defined as the "visual depiction" of a minor "engaging in sexually explicit conduct." 18 U.S.C. § 2256(8); *see United States v. Williams*, 553 U.S. 285, 288 (2008). We refer to such content as "child sexual abuse material" to reflect more accurately the abusive and exploitative nature of child pornography. *Child Sexual Abuse Material*, Nat'l Ctr. for Missing & Exploited Children (accessed Jan. 2, 2025), https://www.missingkids.org/theissues/csam [https://perma.cc/PV8D-GZEX]; *United States v. Larson*, No. 19-cr-50165, 2023 WL 196171, at *1 n.1 (D.S.D. Jan. 17, 2023) (Continued)

Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, 587 (2006); *id.* § 501; *see id.* § 701. Among its many provisions, the Walsh Act amended Section 2252A of Title 18 of the United States Code, to add a criminal ban on "child exploitation enterprises." Adam Walsh Child Protection and Safety Act of 2006 § 701. This case concerns the proper interpretation of that provision.

Christopher William Kuehner actively used a website and a messaging server dedicated to sexual violence and the sexual exploitation of minors. Employing two different usernames, he produced and encouraged the production of child sexual abuse material on these platforms. After authorities revealed that Kuehner was behind the usernames, they charged him with one count of engaging in a child exploitation enterprise. Following a two-day bench trial, Kuehner was convicted and subsequently sentenced to serve twenty years in prison.

On appeal, Kuehner raises several challenges to his conviction. First, he maintains that the district court erroneously interpreted the requirement of the child exploitation enterprises statute that predicate felony offenses be performed "in concert with three or more other persons." The district court considered the number of people involved in the predicate offenses cumulatively. In other words, it was enough that *all* the predicate felonies were committed with a total of three or more other people when summed together.

---

(explaining that pornography "connotes a certain aspect of consent that is impossible when the images or videos depict children," and because of this lack of consent, child sexual abuse material is "evidence of a child being sexually abused."). Other courts have done the same. *See, e.g.*, *United States v. Johnson*, 93 F.4th 605, 608 (2d Cir. 2024); *Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912, at *1 (9th Cir. May 3, 2023); *United States v. Glowacki*, No. 22-3279, 2023 WL 179887, at *1 (6th Cir. Jan. 13, 2023).

Kuehner argues that *each* predicate offense must have been committed in concert with three or more other people. Second, Kuehner argues that there was insufficient evidence to support his conviction for engaging in a child exploitation enterprise. Third, he contends that the district court erred in denying his motion to vacate his conviction and dismiss the indictment because the Government failed to turn over certain information in its possession.

We reject each of these challenges and affirm the judgment of the district court.

## I.     Background

### A.

Kuehner and four co-defendants were charged with one count of knowingly engaging in a child exploitation enterprise in violation of 18 U.S.C. § 2252A(g). One of the co-defendants, Nathan Larson, had created a website called "Rapey.su" (the Website) and served as its administrator.[2] The conduct at issue in Kuehner's criminal case arose from activities on the Website, which was dedicated to discussions of sexual exploitation and rape, and on "Discord," an online communications platform that allows users to message each other, share images and videos, and audio or video call.

---

[2] Larson died in federal pre-trial custody, and the Government subsequently dismissed the indictment as to Larson.

4

Kuehner waived his right to a jury trial and consented to a bench trial. Witnesses at the trial included three minor victims (MVs)[3]: MV1, MV2, and MV7, a co-defendant who pled guilty, Homeland Security Investigation special agents, and forensic analysts and experts, including James Fottrell, Director of the High Technology Investigative Unit of the Department of Justice's Child Exploitation and Obscenity Section.

The Website maintained a dedicated section for users interested in the sexual exploitation of children. This section had forums, galleries, and options that allowed users to message one another privately and in groups. Website users could also earn and display "badges" in their profiles to convey particular messages or the completion of a task, such as a badge for "confirmed rapist" or "confirmed child molester." *See, e.g.*, J.A. 147.[4] "Confirmed" users of the Website were provided greater access to chats with other users and access to non-public galleries and media.

The Government presented evidence that Kuehner joined the Website on September 27, 2020, under the username "nechris." "Nechris" earned the status of confirmed user on the Website by posting a picture of himself with the name of the Website written on his forearm. "Nechris" also earned "Confirmed rapist" and "Rapey" badges. *United States v. Kuehner*, Case No. 22-cr-120, 2023 WL 1422310, at *2 (E.D. Va. Jan. 31, 2023). The "nechris" profile described the user as a 36-year-old, 5'8", "Caucasian/Asian" man from Washington state, which Director Fottrell testified generally matched Kuehner's

---

[3] In an effort to protect their privacy and to avoid revictimization, we avoid using the names and Website usernames of the minor victims. As the egregious facts of this case make abundantly clear, content that is posted online becomes nearly impossible to remove.

[4] Citations to "J.A." refer to the Joint Appendix filed by the parties in this appeal.

description. *Id.* Kuehner admitted to federal agents that he had used his personal email, necryz@gmail.com, to register on the Website as "nechris." On October 6, 2020, some of the information in "nechris's" profile on the Website, including the birth year, location, identifying information, and age, were modified, and the email address associated with the username was changed from necryz@gmail.com to mc3996250@gmail.com.

At trial, the Government produced evidence that Kuehner, under the username "nechris," repeatedly interacted with, encouraged, and pressured minor victims to post child sexual abuse material. Director Fottrell testified about the conduct involving the minor victims. Unless otherwise noted, the events described below took place before the "nechris" profile information was changed on October 6, 2020.

"Nechris" messaged MV1 describing his desire to sexually abuse her and directing her to send him sexually explicit material of herself. Following these instructions, MV1 posted five videos of herself, including videos showing her masturbating. MV1 tagged "nechris" in this post. He acknowledged the videos by thanking her in the gallery where MV1 posted the media. The Website had a public chat that was a "running commentary" between Website users. J.A. 144. In the public chat, "nechris" discussed the child sexual abuse material depicting MV1 with another confirmed adult user and bragged about his role in convincing MV1 to post the material.

MV2 testified at trial about her interactions with "nechris" on Discord. "Nechris" also requested child sexual abuse material from MV2, as well as other minor victims. "Nechris" also sent nude images of himself to MV2. Kuehner's face was visible in some of these images.

6

Director Fottrell testified that "nechris" asked MV3 to produce and post child sexual abuse material. In the public chat, in response to Larson's commentary, "nechris" posted that he was looking forward to MV3's next video. "Nechris" gave a "thumbs up" reaction to a comment by Larson that MV3 was an "ephebophile's delight,"[5] and commented that he "love[d]" the child sexual abuse material depicting MV3. J.A. 123–24. "Nechris" gave a "thumbs up" reaction to a crude comment by Larson about MV3's body. "Nechris" and other users of the Website commented on the child sexual abuse material posted by MV3, expressing their gratification.

In the public chat on the Website with several other confirmed adult users, "nechris" commented "[l]et's see this now" in response to another user who wanted MV4 to produce a child sexual abuse material video. J.A. 112. Another confirmed adult user indicated his agreement and approval by reacting with a "smiley face" to "nechris's" comment. J.A. 112.

"Nechris" also publicly commented on child sexual abuse material posted by MV5, referring to some of this material as "the gold standard." J.A. 111. He encouraged MV5 to make another video, saying "we all look forward to it . . . ." J.A. 111. Another confirmed adult user "liked" a comment by "nechris" about MV5 having engaged in sexually explicit conduct before going to school in the morning.

"Nechris" advised yet another minor, MV6, on the optimal placement of the camera to make child sexual abuse material. MV6 proposed an idea for a child sexual abuse

---

[5] Director Fottrell testified that an "ephebophile" is someone "who is sexually interested [in] post pubescent minors." J.A. 124.

material video and "nechris" encouraged her to record herself engaging in lewd acts because he wanted to watch her. MV6 complied with these requests.

After the "nechris" profile was changed, in the Website's public chat, "nechris" urged MV7 to make a lewd video and pressured her to do so several times, despite MV7 repeatedly declining. Another confirmed adult user joined "nechris" to urge MV7 to produce an exploitative video. MV7 finally acceded to the pressure from "nechris" and other Website members and posted child sexual abuse material.

Kuehner's exploitation of minor victims was not limited to the Website. "Nechris" was one of the individuals who ran a private "server" on Discord, akin to a chat room, to share and distribute child sexual abuse material. "Nechris" and other adult users of the Website invited minor victims, including MV1 and MV2, to join Discord to communicate with one another. All three minor victims who testified at trial, MV1, MV2, and MV7, described their interactions with "nechris" on Discord. "Nechris" had asked each of them to provide sexually explicit content on the Discord server.

Kuehner's principal defense at trial was that someone had impersonated him as "nechris" on the Website and Discord, such that he himself had not engaged in the charged activities. The evidence indicated otherwise, however. Kuehner's own statements implicated him. In addition to Kuehner's confessions about his email address and Website account, Kuehner admitted that he took a confirmation photo for the "nechris" account and posted it to the Website. Even then, Kuehner argued that there was no evidence that he was always behind the "nechris" account.

The Government also presented significant forensic evidence connecting Kuehner to the Website. Federal agents had executed a search warrant of Kuehner's home and recovered a desktop computer, a laptop, and a cell phone. Law enforcement successfully conducted a forensic analysis of the desktop computer and cell phone, but forensic experts could only access the deleted files on the laptop. The evidence presented at trial established that Kuehner had accessed child sexual abuse material, including videos and images of minors, on these devices. Analyses of Kuehner's web browser history and his laptop confirmed that he had used the necryz@gmail.com email address and variations of the alias "nechris."

To support his defense that someone had impersonated him, Kuehner elicited testimony from Director Fottrell that as the Website's creator and administrator, Larson had access to statistics and data pertaining to the Website, including records of users' activity and associated IP addresses. Director Fottrell testified that Larson could edit profiles, change passwords, and modify or delete the administrative logs that track his own actions taken as an administrator. Director Fottrell further testified that there were "three fundamental problems" with the theory that Larson, or perhaps another administrator, impersonated Kuehner. J.A. 152. To impersonate Kuehner as "nechris," Director Fottrell testified that the impersonator would need to know: (1) "nechris's" password; (2) Kuehner's IP address; and (3) how to fake the administrative logs to cover the impersonator's actions.

Director Fottrell specifically testified that without access to "nechris's" password, neither Larson nor any other administrator could login as "nechris" to impersonate

9

Kuehner. Larson could have changed "nechris's" password and then logged in, but he would have been unable to change it back to "nechris's" original password—because Larson never knew the original password. After an extensive review, Director Fottrell identified no evidence suggesting that Larson knew "nechris's" password or that someone else logged in as "nechris." There was no evidence that the password to the "nechris" account had ever been changed. Although it is possible that someone could have altered the IP address to make it appear as if that person was using the Website from "nechris's" location, according to Director Fottrell, it was highly improbable that someone could do so without leaving a record. Director Fottrell further testified that most of the IP addresses connected to "nechris" were from the Seattle area, where Kuehner resided, and that, taken together, it was "very unlikely" that Larson, or another individual, impersonated Kuehner.

## B.

The district court found Kuehner guilty of engaging in a child exploitation enterprise. That statute provides that a:

> person engages in a child exploitation enterprise for the purposes of this section if the person violates section 1591, section 1201 if the victim is a minor, or chapter 109A (involving a minor victim), 110 (except for sections 2257 and 2257A), or 117 (involving a minor victim), as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, and commits those offenses in concert with three or more other persons.

18 U.S.C. § 2252A(g)(2).

The district court held that the evidence at trial "established that Kuehner committed a series of predicate felony violations constituting over three or more separate incidents." *Kuehner*, 2023 WL 1422310, at *6. Section 2251(a) and (e) of Title 18 of the United States

10

Code "criminalize production and attempted production of child [sexual abuse material], which are predicate offenses of engaging in a child exploitation enterprise under § 2252A(g)." *Kuehner*, 2023 WL 1422310, at *6. Kuehner "violated or attempted to violate 18 U.S.C. § 2251(a)," and his conduct "also constituted enticement or attempted enticement of a minor to engage in unlawful sexual conduct in violation of 18 U.S.C. § 2422(b)." *Kuehner*, 2023 WL 1422310, at *7–8. The district court sentenced Kuehner to the mandatory minimum sentence of twenty years' incarceration, as well as twenty years' supervised release.

After sentencing, Kuehner filed a motion to vacate the district court's judgment, commitment order, and memorandum opinion, and to dismiss the indictment, or, in the alternative, to grant him a new trial. Kuehner argued that the Government's failure to disclose material it received in response to subpoenas sent to Google and Discord was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Following an evidentiary hearing, the district court denied Kuehner's motion. Kuehner filed a timely appeal.

## II.    Analysis

Kuehner contends that the district court erred in three ways. First, he challenges the district court's interpretation of the "in concert with" requirement of the child exploitation enterprises statute. Second, he maintains that there was insufficient evidence to support his guilty verdict. Third, he contends that the district court erred in denying his *Brady* motion

11

because the Government failed to turn over material and exculpatory information received from various Google and Discord accounts. We address each in turn.

### A.  Statutory Interpretation of the Child Exploitation Enterprises Statute

Kuehner maintains that the district court's interpretation of the child exploitation enterprises statute was erroneous because the statute requires a defendant to act "in concert with" three or more individuals when committing *each* of the predicate felony offenses. He also maintains that the rule of lenity requires us to interpret the child exploitation enterprises statute in his favor. We disagree with both arguments.

We review issues of statutory interpretation *de novo* and begin our interpretation with the plain text of the statute. *United States v. Muhammed*, 16 F.4th 126, 127–28 (4th Cir. 2021). A person violates the child exploitation enterprises statute if that person "as a part of a series of felony violations constituting three or more separate incidents and involving more than one victim, . . . commits *those offenses* in concert with three or more other persons." 18 U.S.C. § 2252A(g)(2) (emphasis added). The most natural reading of this text is that the phrase "those offenses" refers to the collective "series of felony violations." The phrase "with three or more other persons" modifies "those offenses," thereby indicating that the series of felony offenses must have been committed with "three or more other persons." A person will therefore have been found to have engaged in a child exploitation enterprise if the predicate felony offenses, as a series: (1) constituted three or more separate incidents; (2) involved more than one victim; and (3) were committed in concert with three or more people. If Congress wanted to require that *each* predicate

12

offense be committed in concert with three or more people, the statute would have included this requirement.

We decline to adopt Kuehner's strained construction of the statute to require that "each" predicate offense be committed in concert with three or more other people and find ourselves in good company. All our sister circuits that have addressed this interpretive question have held that the number of people for the "in concert with" requirement may be considered cumulatively. *See, e.g.*, *United States v. El-Battouty*, 38 F.4th 327, 329 (3d Cir. 2022); *United States v. DeFoggi*, 839 F.3d 701, 710 n.4 (8th Cir. 2016); *United States v. Grovo*, 826 F.3d 1207, 1215 (9th Cir. 2016); *see also United States v. Daniels*, 653 F.3d 399, 412 (6th Cir. 2011). Not a single circuit has interpreted the child exploitation enterprises statute in the manner urged by Kuehner.

The continuing criminal enterprise statute, 21 U.S.C. § 848, informs our reading of the child exploitation enterprises statute as well. The child exploitation enterprises statute and the continuing criminal enterprise statute are structured similarly: a person is found to have engaged in either enterprise if that person committed certain predicate felonies, and such violations are part of a series committed in concert with several people. *See Grovo*, 826 F.3d at 1214; *compare* 18 U.S.C. § 2252A(g)(2) *with* 21 U.S.C. § 848(c). In relevant part, the continuing criminal enterprise statute requires that the requisite predicate felony violations be "undertaken by such person in concert with five or more other persons . . . ." 21 U.S.C. § 848(c)(2)(A). In defining "in concert with" under the continuing criminal enterprise statute, this court has not required that each predicate felony have been committed by five individuals at the same time or even that five people collectively

13

engaged in a single specific offense. *See United States v. Johnson*, 54 F.3d 1150, 1155 (4th Cir. 1995) (quoting *United States v. Ricks*, 882 F.2d 885, 891 (4th Cir. 1989)). We decline to construct the child exploitation enterprises statute in a contradictory manner.

Kuehner also contends that the rule of lenity requires us to find in his favor due to the ambiguity present in the interpretation of the child exploitation enterprises statute. The rule of lenity guides courts to "strictly construe[ ]" criminal statutes and avoid interpreting them to "extend criminal liability beyond that which Congress has 'plainly and unmistakably' proscribed." *United States v. Hilton*, 701 F.3d 959, 966 (4th Cir. 2012) (citation omitted). "Under [this] well-established principle of statutory construction, ambiguities in criminal statutes must be resolved in favor of lenity for the accused." *United States v. Headspeth*, 852 F.2d 753, 759 (4th Cir. 1988). This rule, however, is employed only if, after "considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' . . . such that the Court must simply 'guess as to what Congress intended.'" *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citations and quotations omitted). No such uncertainty or ambiguity exists here. Upon review of the text of the child exploitation enterprises statute, we find that the meaning is clear and does not call for application of the rule of lenity.

We hold that the child exploitation enterprises statute does not require that *each* predicate felony be committed "in concert with" three or more people. The required total of three or more people can be summed across the relevant predicate offenses.

14

B.    Sufficiency of the Evidence

We next address Kuehner's contentions regarding the sufficiency of the evidence. Kuehner maintains that there was insufficient evidence to convict him because (1) someone else could have used the "nechris" account and (2) the predicate felonies were not performed in concert with at least three other people.

We review "judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous," and legal findings are reviewed *de novo*. *United States v. Landersman*, 886 F.3d 393, 406 (4th Cir. 2018) (quoting *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016)). The court should "uphold a guilty verdict if, taking the view most favorable to the Government, there is substantial evidence to support the verdict. 'Substantial evidence' means evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at 406 (quoting *United States v. Armel*, 585 F.3d 182, 184 (4th Cir. 2009)).

1.

The district court did not clearly err in finding that no one else accessed the "nechris" account and impersonated Kuehner. Indeed, the Government presented substantial evidence showing that, at the time of the conduct in question, Kuehner controlled the "nechris" account.

Kuehner's own admissions to federal law enforcement agents established that his username on the Website was "nechris." The three minor victims identified Kuehner in open court and testified that "nechris" told them his name and, in some instances, shared

15

other specific details about his life that pertained to his family, location, and age. He even shared photos of himself. All of these details described Kuehner accurately.

The forensic evidence presented at trial also overwhelmingly supported a conclusion that Kuehner was "nechris": The IP addresses, computer files, browser history, and shortcut files all indicate that Kuehner accessed child sexual abuse material on the Website and used the username "nechris." Further strengthening this conclusion is Director Fottrell's testimony on how unlikely it was for anyone else to have accessed the "nechris" account and Kuehner's failure to identify any forensic evidence of anyone else logging in under this username. The most reasonable inference, based on the evidence in the light most favorable to the Government, is that Kuehner operated the "nechris" account.

### 2.

Kuehner's final argument is that, even if there is sufficient evidence that there had been a "tacit agreement" among Kuehner and others to produce or attempt to produce child sexual abuse material, that is only evidence of a conspiracy to commit those offenses, and not evidence of a violation of the child exploitation enterprises statute. The Supreme Court has recognized, however, that "the plain meaning of the phrase 'in concert' signifies mutual agreement in a common plan or enterprise" and requires proof of a conspiracy. *Rutledge v. United States*, 517 U.S. 292, 300 (1996). There is no reason why this meaning does not apply equally to the child exploitation enterprises statute. *See DeFoggi*, 839 F.3d at 710;

16

*Grovo*, 826 F.3d at 1214; *Daniels*, 653 F.3d at 413; *United States v. Wayerski*, 624 F.3d 1342, 1351 (11th Cir. 2010).

The Government need only produce evidence showing that Kuehner entered into "an agreement with three or more other persons to commit the series of predicate felonies." *Grovo*, 826 F.3d at 1214. An agreement need not be explicit. This court has established that an "agreement may be inferred from the facts and circumstances of the case," and "a tacit or mutual understanding among or between the parties will suffice." *United States v. Baker*, 985 F.2d 1248, 1255 (4th Cir. 1993) (first quote); *United States v. Depew*, 932 F.2d 324, 326 (4th Cir. 1991) (second quote). There was sufficient evidence to conclude that Kuehner had tacitly agreed with other Website users to produce or attempt to produce child sexual abuse material and entice or attempt to entice minor victims to engage in unlawful sexual conduct. *See Grovo*, 826 F.3d at 1216.

The Government also produced evidence sufficient to show that Kuehner acted "in concert" with at least three other people, and the district court did not err in relying on evidence from the Website's public chat, including Kuehner's comments and likes in the public chat. Taking the view most favorable to the Government, a reasonable factfinder could conclude beyond a reasonable doubt that Kuehner produced and attempted to produce child sexual abuse material and enticed or attempted to entice minor victims to engage in unlawful sexual conduct with the approval and support of other confirmed Website users. *See id.* at 1216. Kuehner repeatedly encouraged minor victims to post and share child sexual abuse material because users on the Website wanted to see that material.

17

Taken together, the Government presented substantial evidence that Kuehner committed the predicate felonies in concert with three or more people.

### C.     *Brady* Violation

Finally, Kuehner maintains that the Government violated *Brady v. Maryland* by failing to disclose information it received from Google and Discord about various accounts. Kuehner also contends that the district court erred in denying his motion to vacate his conviction or, in the alternative, to order a new trial. In *Brady*, the Supreme Court held that the prosecution's withholding of evidence that was favorable to a defendant and material to guilt or punishment violated the defendant's due process rights. 373 U.S. at 87.

The court reviews a district court's denial of a motion for a new trial under the abuse of discretion standard. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). We review the district court's legal conclusions in a *Brady* ruling *de novo* and its factual findings under the clear error standard. *United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011).

To establish a *Brady* violation, Kuehner must show: "(1) that the undisclosed information was favorable, either because it was exculpatory or because it was impeaching; (2) that the information was material; and (3) that the prosecution knew about the evidence and failed to disclose it." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015). "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). Evidence is material if "there is a reasonable probability that, had the evidence

18

been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* It is undisputed that the Government had in its possession information from Google and Discord and failed to disclose it. Kuehner does not argue that this information was impeaching. He contends that the information was both exculpatory and material. Even assuming the information was exculpatory, the information from neither Google nor Discord is material.

Relevant here, the Government issued subpoenas to Google to produce information about the mc3996250@gmail.com email account and Discord to produce information about the "Nekryz#9079" account. The information received from Google showed that mc3996250@gmail.com had been created on October 6, 2020, and was registered to a "John McJanal."

According to Kuehner, the information received by the Government from Google showed that someone other than him created and used mc3996250@gmail.com and posted as "nechris" on the Website after October 6, 2020. Yet Kuehner fails to explain how that is material when most of the offending conduct took place prior to October 6, 2020. Kuehner also offers no convincing response to the forensic evidence connecting him to mc3996250@gmail.com, including evidence that this email was accessed from a tablet recovered from Kuehner's home and created at the request of a user with an IP address from the area in which Kuehner lived.

Kuehner's contentions regarding the information received from Discord are equally unavailing. Discord was "unable to locate a user" by the username of "Nekryz#9079" and

19

had "no information" on this account. J.A. 488. The Government posits that this was due to Discord's retention policy. At that time, Discord deleted a user's information from its back-up systems after 45 days. Even if the information from Discord had been disclosed, it was not material to Kuehner's claim that he had been impersonated. The evidence in the record still tied Kuehner to this Discord account. Director Fottrell testified that "nechris" invited a minor Website user to join him on Discord under the name "Nekyrz#9079." There was an overwhelming amount of evidence against Kuehner notwithstanding the information from Discord about the "Nekryz#9079" account. Kuehner has not demonstrated a reasonable probability that the information produced by Discord would have made the difference between conviction and acquittal. *See Bagley*, 473 U.S. at 682; J.A. 514–15.

We find no *Brady* violation. The district court did not abuse its discretion in denying Kuehner's motion to vacate his conviction, or, in the alternative, for a new trial.

## III.     Conclusion

We hold that the total number of people required for the "in concert with" element may be summed across the series of predicate offenses under the child exploitation enterprises statute. We also hold that there was sufficient evidence to convict Kuehner of engaging in a child exploitation enterprise, and that the Government did not commit a *Brady* violation.

The district court's judgment is therefore

*AFFIRMED*.