**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4745**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RONALD HERRERA CONTRERAS, a/k/a Espeedy, a/k/a Speedy, a/k/a Joster Hrndz, a/k/a Chucho,

Defendant - Appellant.

---

**No. 22-4746**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PABLO MIGUEL VELASCO BARRERA, a/k/a Oscuro, a/k/a Pablo Miguel Barrera Velasco, a/k/a Miguel Barrera,

Defendant - Appellant.

---

**No. 23-4005**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HENRY ZELAYA MARTINEZ, a/k/a Certero, a/k/a El Kakarra,

Defendant - Appellant.

_____

**No. 23-4006**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DUGLAS RAMIREZ FERRERA, a/k/a Mortal, a/k/a Darwin, a/k/a Artillero,

Defendant - Appellant.

_____

**No. 23-4020**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ELMER ZELAYA MARTINEZ, a/k/a Killer, a/k/a Morenito Martinez, a/k/a Perez Danillo,

Defendant - Appellant.

_____

Appeals from the United States District Court for the Eastern District of Virginia at Alexandria.  Rossie David Alston, Jr., District Judge.  (1:18-cr-00123-RDA-4; 1:18-cr-00123-RDA-8; 1:18-cr-00123-RDA-6; 1:18-cr-00123-RDA-12; 1:18-cr-00123-RDA-2)

2

Argued:  December 10, 2024                              Decided:  August 14, 2025

Amended:  August 29, 2025

Before WILKINSON, QUATTLEBAUM, and BERNER, Circuit Judges.

Nos. 22-4745, 22-4746, 23-4006, 23-4020 affirmed, and No. 23-4005 affirmed in part, vacated in part, and remanded, by published opinion.  Judge Berner wrote the opinion, in which Judge Wilkinson and Judge Quattlebaum joined.  Judge Quattlebaum wrote a concurring opinion.

**ARGUED:**   Paul Peter Vangellow, Falls Church, Virginia; Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant.  Alexander Edward Blanchard, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Jesse I. Winograd, LAW OFFICE OF JESSE WINOGRAD PLLC, Washington, D.C., for Appellant Ronald Herrera Contreras.  David J. Kiyonaga, LAW OFFICE OF DAVID J. KIYONAGA, Alexandria, Virginia, for Appellant Henry Zelaya Martinez.   Benjamin M. Schiffelbein, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Roanoke, Virginia, for Appellant Duglas Ramirez Ferrera.  Robert L. Jenkins, Jr., BYNUM & JENKINS, PLLC, Alexandria, Virginia, for Appellant Elmer Zelaya Martinez.  Jessica D. Aber, United States Attorney, Richmond, Virginia, Cristina C. Stam, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

3

BERNER, Circuit Judge:

This case arises from the kidnapping and murder of two children by members of the La Mara Salvatrucha gang, also known as "MS-13." Appellants Ronald Herrera Contreras, Pablo Miguel Velasco Barrera, Henry Zelaya Martinez, Duglas Ramirez Ferrera, and Elmer Zelaya Martinez were each indicted on eight counts and they were tried together. The jury returned guilty verdicts on all counts for all of the Appellants following an eight-week trial. Appellants appeal their convictions. We affirm the guilty verdicts on all counts. We vacate the sentence of Henry Zelaya Martinez and remand for the sole purpose of his resentencing.

## I. Background[1]

Appellants were members of MS-13, a violent transnational gang.[2] MS-13 engages in crimes including: aggravated assault; robbery; homicide; extortion; and human, narcotics, and firearm trafficking. The gang has a complex hierarchical structure, including subdivisions called programs and even smaller local groups called "cliques." 4 J.A. 1316.[3]

---

[1] We review the facts in the light most favorable to the prevailing party at trial and in the hearings for the motion to suppress, in this case the Government. *United States v. Sanders*, 107 F.4th 234, 240–41 (4th Cir. 2024).

[2] In previous cases, this court has detailed the history, structure, and purpose of MS-13. *E.g.*, *United States v. Contreras-Avalos*, 139 F.4th 314, 318 (4th Cir. 2025); *United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010).

[3] Citations to "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Appellants were all members or associates of the Park View Locos Salvatrucha (PVLS) clique[4] which operates in Northern Virginia and elsewhere.

Two children (Victim 1 and Victim 2)[5] were brutally murdered by Appellants in the summer of 2016. Appellants lured each of them to a remote park at night where they stabbed them to death. Victim 1 and Victim 2 knew one another. Victim 2 became a low-ranking affiliate of PVLS at just thirteen years old. Victim 2 had introduced Victim 1 to members of PVLS with the hope that he too would join. Like Victim 2, Victim 1 also became a low-ranking affiliate of PVLS. Victim 2 was just fourteen years old at the time he was murdered. Victim 1 was seventeen.

In August 2016, Victim 2 forwarded a photo of Victim 1 to several high-ranking PVLS leaders. On the basis of the photo, the PVLS leaders concluded that Victim 1 was affiliated with a rival gang. They immediately issued a "green light"—gang parlance for a death sentence—calling for Victim 1 to be murdered.

Several MS-13 members, including Elmer and Henry Zelaya, Ramirez Ferrera, and Herrera Contreras, devised a plot to carry out this directive. The MS-13 members told Victim 1 to come to the park by himself to attend an MS-13 meeting. Victim 1 complied and came to meet the members. Victim 1 walked with the MS-13 members to a secluded area in the park. Velasco Barrera remained behind to serve as a lookout. There, Victim 1

---

[4] Herrera Contreras and Ramirez Ferrera were members of different local cliques of MS-13, though both were affiliated with PVLS.

[5] We will refer to the minor victims as Victim 1 and Victim 2 to protect their privacy and that of their bereaved families.

was brutally murdered. Henry Zelaya was the first to stab Victim 1. The others joined, stabbing Victim 1 to death using knives, a machete, and a pickaxe. Velasco Barrera eventually left his lookout spot and also took part in the murder. At least one person recorded a video during the murder. The assistant chief medical examiner assigned to examine Victim 1's corpse testified that he had been stabbed over 100 times. The group then dug a shallow grave in the park, butchered Victim 1's body, and buried his remains.

Sometime after murdering Victim 1, Ramirez Ferrera, Henry and Elmer Zelaya, and Herrera Contreras unlocked and examined Victim 1's cellphone. There they discovered that their ostensible reason for murdering Victim 1—that he had been a member of a rival gang—had been a mistake. On Victim 1's phone, they discovered a photo of him flashing an MS-13 hand sign. This indicated that Victim 1 had not, in fact, been associated with a rival gang. The group hid their discovery from the PVLS leadership. Because of their roles in the murder, Elmer and Henry Zelaya, Ramirez Ferrera, and Velasco Barrera all received promotions within the PVLS clique.[6]

Later that summer, rumors began to spread that Victim 2 was cooperating with law enforcement. Based on little more than guesses and gossip, PVLS leadership decreed that Victim 2 must be killed and approved a "green light" calling for his murder. In September, Elmer Zelaya, Herrera Contreras, and other MS-13 members picked up Victim 2 and drove him to the same park where they murdered Victim 1 the prior month. There, Appellants

---

[6] Herrera Contreras was not promoted for his participation in murder of Victim 1 because his local clique did not give him permission to participate in the PVLS-sanctioned murder. This was not for a lack of trying, however. Herrera Contreras actively sought a promotion for his role in Victim 1's murder.

6

together with other MS-13 members stabbed Victim 2 to death. Elmer Zelaya cut Victim 2's neck with a knife. For about half an hour, Appellants and the others attacked Victim 2 with knives, a machete, and a pickaxe. Herrera Contreras directed another gang member to remove Victim 2's Nike Cortez shoes. As they had done with Victim 1, Appellants butchered Victim 2's body and buried it in a freshly dug shallow grave.

Portions of Victim 2's murder were videoed by one of the Appellants on a cellphone. Victim 2's autopsy indicated that he had been stabbed so forcefully that his lower jaw was bisected, portions of his skull were fractured into 13 pieces, and his thigh bones and one of his shinbones were fractured. After the murder, Herrera Contreras regularly wore the shoes that had been taken from Victim 2's corpse. Once again, because of their role in the murder, Elmer Zelaya, Ramirez Ferrera, and Velasco Barrera received promotions within PVLS.[7]

\* \* \*

A federal grand jury returned an eight-count indictment charging Appellants with the following counts:

- **Count 1**: Conspiracy to commit kidnapping and murder of Victim 1 in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5);

- **Count 2**: Conspiracy to commit kidnapping and murder of Victim 2 in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5);

- **Count 3**: Conspiracy to kidnap Victim 1, in violation of 18 U.S.C. § 1201(c);

---

[7] Herrera Contreras also did not receive a promotion for participating in the murder of Victim 2, likely because he did not have the permission of his MS-13 clique to participate.

7

- **Count 4**: Conspiracy to kidnap Victim 2, in violation of 18 U.S.C. § 1201(c);
- **Count 5**: Murder of Victim 1 in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) and (2);
- **Count 6**: Murder of Victim 2 in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) and (2);
- **Count 7**: Kidnapping of Victim 1 resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and (2); and
- **Count 8**: Kidnapping of Victim 2 resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and (2).

Four of the eight counts, Counts 1, 2, 5 and 6, were charged under the Violent Crimes in Aid of Racketeering Activity statute, or VICAR. 18 U.S.C. § 1959. VICAR requires the prosecution to prove the crimes were committed as part of a criminal enterprise and pursuant to a pattern of racketeering activity. *Id.*

Appellants pled not guilty and exercised their constitutional right to a jury trial. The trial lasted over eight weeks. Following the close of the Government's case, Appellants moved for judgments of acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motions. Appellants renewed their motions to dismiss at the close of evidence, which the district court also denied. The jury convicted Appellants on all eight counts. Appellants were sentenced to ten years' incarceration on each of Counts 1 and Count 2 and life imprisonment without the possibility of parole on each of Counts 3 to 8, to run concurrently, followed by five years' supervised release.

Appellants raise numerous issues on appeal, some individual, some joint, and some collective. Having considered all of Appellants' arguments, we now turn to our analysis.

8

We begin by addressing various challenges to evidentiary rulings made by the district court. Next, we turn to the district court's denial of requested jury instructions. Finally, we address specific individual and joint challenges.

## II. Analysis

### A. Evidentiary Challenges

Appellants raise a number of challenges to the admission of certain evidence during trial, which we discuss in turn below.

### 1. Expert Testimony

Over Appellants' repeated objection, the district court qualified Ricardo Guzman, a Houston Police Department sergeant, as an expert witness and permitted him to testify about the history, rules and activities of MS-13. Appellants contend that the district court improperly qualified Guzman as an expert because he lacked the requisite experience with MS-13 in the Mid-Atlantic region. They also argue that Guzman's testimony improperly relied upon inadmissible hearsay. We address these arguments in turn.

A district court may admit the testimony of a "witness who is qualified as an expert by knowledge, skill, experience, [or] training" if (1) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. A witness's qualifications under Rule 702 are judged liberally. *Kopf v. Skyrm*, 993 F.2d 374,

9

377 (4th Cir. 1993). We review a district court's qualification of an expert witness for an abuse of discretion. *See United States v. Johnson*, 617 F.3d 286, 292–94 (4th Cir. 2010).

Guzman testified regarding his extensive professional experience with MS-13 and, of particular relevance here, with MS-13 homicide investigations. He participated in approximately 25 MS-13 homicide investigations as both a sergeant and task force officer, five of which were in the "DMV" (the region that includes the District of Columbia, and its surrounding suburbs in Maryland and Virginia). Guzman had attended relevant professional trainings in the United States and Central America. At trial, Guzman testified specifically about becoming familiar with PVLS in Virginia through his investigative work. Accordingly, we conclude that the district court did not abuse its discretion in qualifying Guzman as an MS-13 expert.

Appellants' argument that Guzman's testimony was improperly based on inadmissible hearsay in violation of the Confrontation Clause also fails. "To be admissible in federal court, evidence must satisfy both the Federal Rules of Evidence and the [U.S. Constitution's] Confrontation Clause." *United States v. Seward*, 135 F.4th 161, 166 (4th Cir. 2025). Under Federal Rule of Evidence 703, an expert may opine on facts or data in the case for which she has been made aware of or personally observed. Rule 703 also permits an expert to rely on inadmissible evidence if experts in that field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Constitutional concerns can, however, be implicated by the admission of a type of hearsay referred to as testimonial hearsay. Although the Supreme Court has not provided an exhaustive or comprehensive definition of "testimonial hearsay," it can include

10

"extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, . . . or confessions" and custodial interrogations. *United States v. Udeozor*, 515 F.3d 260, 268 (4th Cir. 2008) (quoting *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004)). We review evidentiary rulings involving the Confrontation Clause *de novo*. *Seward*, 135 F.4th at 166.

In *Crawford v. Washington*, the Supreme Court held that admitting testimonial hearsay by a nontestifying witness generally violates a defendant's Sixth Amendment Confrontation Clause rights unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. 541 U.S. at 53–54. Thus, expert witnesses are barred from repeating testimonial hearsay as evidence. *United States v. Mejia*, 545 F.3d 179, 198–99 (2d Cir. 2008). Expert witnesses are not, however, precluded from "offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). The proper question for a court, therefore, is "whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." *United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010) (quoting *Johnson*, 587 F.3d at 635).

Guzman's testimony did not run afoul of this rule. Far from serving as a "conduit or transmitter for testimonial hearsay," Guzman gave "an independent judgment . . . applying his training and experience to the sources before him." *Johnson*, 587 F.3d at 635. Guzman explained to the jury the history and structure of MS-13. His testimony was based on his extensive experience, knowledge, and personal observations, much of which was not

11

derived from testimonial hearsay. The fact that Guzman's "expertise was in some way shaped by [his] exposure to testimonial hearsay does not mean that the Confrontation Clause was violated when [he] presented [his] independent assessment[ ] to the jury." *Id.* at 636. Appellants' counsel had an opportunity to cross-examine him, and did so. *See id.* Accordingly, we conclude that there was no violation of the Confrontation Clause.

### 2. Historical Racketeering Evidence

Appellants next contend that the district court abused its discretion in admitting "historical racketeering evidence." They argue that this evidence misled the jury and prejudiced Appellants in violation of Federal Rule of Evidence 403. As used in this case, "historical racketeering evidence" refers to evidence the Government introduced regarding three other MS-13 murders in which Appellants had no involvement.

Federal Rule of Evidence 403 permits, but does not require, a federal court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403 generally favors admissibility, and district courts "enjoy wide discretion to determine what evidence is admissible under the Rule." *Udeozor*, 515 F.3d at 265. A district court's Rule 403 decision to admit evidence will not be overturned except under the most extraordinary circumstances. *Id.*

We see no extraordinary circumstances here. The Government's evidence about the three other murders had significant probative value particularly to the Government's case

under VICAR because it was required to show there was a racketeering enterprise. *See, e.g.*, *United States v. Martinez*, 92 F.4th 1213, 1242–49 (10th Cir. 2024).

Although the evidence was most certainly prejudicial—it established that Appellants, as members of MS-13, were members of an enterprise that carried out murders—it was not unduly so. The probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. *Udeozor*, 515 F.3d at 264. Any prejudice was mitigated by defense counsel's opportunity to cross-examine the relevant witnesses. Counsel solicited testimony that their clients were not involved in the three other murders. The district court also instructed the jury that Appellants were "not on trial for any act or any conduct not specifically charged in the indictments," 12 J.A. 5357, and we presume jurors follow the instructions of the district court. *United States v. Camara*, 908 F.3d 41, 49 (4th Cir. 2018) (quoting *United States v. Olano*, 507 U.S. 725, 740 (1993)). We therefore conclude that the district court did not abuse its discretion in admitting the Government's historical racketeering evidence.[8]

### 3. Video and Photo Evidence

Appellants maintain that the district court abused its discretion when it admitted certain disturbing and graphic videos and photos. Specifically, they challenge three categories of evidence: two videos of the murders, photos of the excavation of Victim 1 and Victim 2's graves, and autopsy photos.

---

[8] Because we hold that the district court did not abuse its discretion in admitting this evidence, we need not decide whether Velasco Barrera preserved his evidentiary objection or whether a harmless or plain error standard would apply.

13

"Rule 403 authorizes a trial court to 'exclude relevant evidence if its probative value is substantially outweighed by a danger of,' as relevant here, 'unfair prejudice.'" *United States v. McCabe*, 103 F.4th 259, 277 (4th Cir. 2024) (citing Fed. R. Evid. 403). Graphic evidence is regularly admitted, including photos showing the state of a victim's corpse upon discovery. *United States v. Simpson*, 44 F.4th 1093, 1098 (8th Cir. 2022); *United States v. Perry*, 35 F.4th 293, 325 (5th Cir. 2022) (holding that the district court did not abuse its discretion in admitting photos of corpses with "open wounds, blood and gore"). "Autopsy photos can have immense probative value, if, for example they confirm the prosecution's theory about the manner in which the crime was committed." *United States v. Rezaq*, 134 F.3d 1121, 1138 (D.C. Cir. 1998).

Certain evidence and testimony presented at trial was undoubtedly gruesome. Perhaps the most disturbing of all were two videos recorded during Victim 2's murder. We agree with the Government, however, that the videos' probative value was not outweighed by the risk of unfair prejudice. The videos placed several of the Appellants at the scene of the crime; corroborated witness testimony; helped establish the victims' identities; and depicted parts of the events that were the subject of the charges.

While the Government could have relied on other video and photo evidence to meet its burden of proof, Rule 403 "does not bar powerful, or even 'prejudicial' evidence." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998); *see also United States v. Lujan*, 603 F.3d 850, 858 (10th Cir. 2010) ("[T]he vicious, brutal nature of a defendant's conduct is not itself sufficient to justify a complete exclusion of evidence tending to show the defendant engaged in those acts."). The video was not duplicative of other evidence the

14

Government presented at trial nor did the Government introduce the video evidence solely for its shock value. *See, e.g.*, *United States v. Bailey*, 840 F.3d 99, 121–24 (3d Cir. 2016). Applying a deferential standard of review, we conclude that the district court did not abuse its discretion in admitting video evidence of the crime.

Appellants point out that following the showing of one of the videos, the jury sent a note to the district court asking for a warning prior to the showing of graphic videos. Appellants maintain that this note is evidence of the jury's extreme emotional reaction to the videos. While the videos might have been disturbing to the jury, unfair prejudice requires a showing of "a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Udeozor*, 515 F.3d at 264 (citation omitted). On our review of the record, we cannot say that the video evidence was so unfairly prejudicial that it risked causing the jury to act irrationally.

Appellants also object to the admission of 27 photographs of the sites where Appellants attempted to bury the victims' remains. Although some jurors may have been shocked by what they saw, Appellants have failed to establish that any prejudicial effect of the photos' admission substantially outweighed their probative value.

15

Finally, Appellants challenge the admission of certain gruesome autopsy photos showing the victims' bodies in varying states of decomposition.[9] These photos had significant probative value. They corroborated the testimony of the former assistant medical examiner, the forensic anthropologist, and other witnesses; helped establish intent; and allowed the jury to see for themselves the abhorrent nature of the crime. While the photos may have been upsetting for the jury to view, such was the nature of the crime. We discern no abuse of discretion by the district court in admitting this evidence.

## B. Jury Instruction Challenges

### 1. Duress Instruction

Appellants challenge the district court's refusal to instruct the jury on a duress defense. The crux of Henry Zelaya, Ramirez Ferrera, and Velasco Barrera's theory of defense was that they acted under duress because MS-13 members who fail to cooperate with gang orders would be punished with physical violence or even death.[10] In support of this theory, Henry Zelaya and Ramirez Ferrera proposed a jury instruction on a coercion defense. Velasco Barrera's counsel referenced a duress instruction during his opening

---

[9] The photos introduced into evidence were a small fraction of the photos available to the Government in support of its case. The Government introduced sixteen photos of Victim 1's remains and two photos of Victim 2's remains. Of these, only six photos of Victim 1's body were shown to the jury, while both photos of Victim 2 were shown. The Government was in possession of dozens of other autopsy and crime scene photos it could have moved into evidence.

[10] Herrera Contreras and Elmer Zelaya did not propose a duress instruction or otherwise oppose the Government's request to preclude such a defense. Their unpreserved claims that they were entitled to such a defense are reviewed under the plain error standard. *United States v. Jackson*, 126 F.4th 827, 861 n.11 (4th Cir. 2025).

16

statement. The district court declined to provide a duress instruction as to any defendant for any of the counts alleged.

This court reviews the district court's refusal to provide a requested jury instruction under the abuse of discretion standard. *United States v. Cannady*, 924 F.3d 94, 101 (4th Cir. 2019). To establish a duress defense, a defendant "must produce evidence which would allow the factfinder to conclude" that: he "was (1) under unlawful and present threat of death or serious bodily injury; (2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm);" and that there was "(4) a direct causal relationship between the criminal action and the avoidance of the threatened harm." *United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir. 1989).

Assuming without deciding that such a defense is even available for VICAR murder or VICAR conspiracy to commit murder, Appellants cannot establish that all four *Crittendon* factors are met. Our analysis begins and ends with the first *Crittendon* factor. "[G]eneralized fears will not support" the duress defense. *Crittendon*, 883 F.2d at 330. Instead, a defendant must show that a "real and specific threat existed at the time" of the defendant's illegal conduct. *Id.* No such evidence is reflected in the record. Consider, for example, *United States v. Mooney*, 497 F.3d 397 (4th Cir. 2007). There, the first *Crittendon* factor was satisfied where an individual held a gun to the defendant's forehead, requiring the defendant to take a gun from the individual, thereby forcing the defendant to possess a firearm unlawfully. *Mooney*, 497 F.3d at 406. Appellants, by contrast, intentionally and voluntarily went to the park for the sole purpose of participating in the murders. To be sure,

17

within the MS-13 hierarchy, obedience is required. Refusing to comply with an MS-13 order would almost certainly bring consequences, potentially fatal ones. One witness, who was ordered to strike Victim 2 with a weapon, explained that if he declined to obey the order, it might have been he who was killed. The duress defense is a narrow one, however. A generalized fear of reprisal, even one that is likely, is no defense to criminal conduct. *See United States v. King*, 879 F.2d 137, 139 (4th Cir. 1989).

We need not reach the remaining *Crittendon* factors. We therefore hold that the district court did not abuse its discretion in declining to instruct the jury on duress.

### 2. Jury Instruction on a Lesser Included Offense

Henry Zelaya maintains that the district court abused its discretion when it declined to instruct the jury on whether aggravated assault with a deadly weapon was a lesser included offense of conspiracy to commit kidnapping and murder in aid of racketeering activity. The district court decided against giving a lesser included offense instruction, concluding that "the evidence in this case does not support a rational inference that Henry Zelaya Martinez merely assaulted the victims." 12 J.A. 5337–38.

We review the denial of a proposed jury instruction under the abuse of discretion standard. *E.g.*, *Cannady*, 924 F.3d at 101. Under Federal Rule of Criminal Procedure 31(c)(1), a jury can return a guilty verdict as to "an offense *necessarily* included in the offense charged." Fed. R. Crim. P. 31(c)(1) (emphasis added). A defendant is entitled to an instruction on a lesser included offense if 1) "the elements of the lesser offense are a subset of the elements of the charged offense," *Schmuck v. United States*, 489 U.S. 705, 716–17 (1989), and 2) "the evidence would permit a jury rationally to find him

18

guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208 (1973).

In this case, the asserted lesser included offense (aggravated assault with a deadly weapon) is not a subset of the greater offense (conspiracy to commit kidnapping and murder in aid of racketeering activity).[11] *See, e.g.*, *Schmuck*, 489 U.S. at 716–17; *United States v. Walker*, 75 F.3d 178, 180 (4th Cir. 1996). A few examples illustrate why this is the case. An individual can commit conspiracy to commit murder and kidnapping in aid of racketeering without committing aggravated assault with a deadly weapon. A defendant could also commit conspiracy to murder or kidnap an individual without using a deadly weapon.[12] Further, a conspiracy is an agreement, while aggravated assault with a deadly weapon requires that the crime be completed. The differences between the statutory elements are sufficient to defeat Henry Zelaya's challenge. Therefore, the district court did not abuse its discretion in denying his request for a lesser included offense instruction.

---

[11] According to Henry Zelaya's proposed instruction, for aggravated assault with a deadly weapon, the Government had to prove beyond a reasonable doubt that the defendant 1) "committed an unlawful assault upon another," 2) "did so with a dangerous weapon," and 3) "did so with intent to do bodily harm." 12 J.A. 5306. By contrast, for conspiracy to commit kidnapping and murder in aid of racketeering, the jury was instructed that the Government had to prove beyond a reasonable doubt that 1) "an enterprise engaged in, or the activities of which affect, interstate or foreign commerce existed," 2) "the enterprise was engaged in racketeering activity," 3) "the defendant had a position in the enterprise," 4) "the defendant knowingly and unlawfully conspired with others to kidnap and/or murder" either victim, and 5) "one of the defendant's purpose in doing so was to maintain or increase his position in the enterprise." 12 J.A. 5375–76.

[12] That this conspiracy involved deadly weapons is of no import to our analysis because our analysis is based on the statutory elements. *See Schmuck*, 489 U.S. at 716–17.

## C. Individual and Joint Challenges

We turn now to other challenges raised by Appellants individually and jointly.

### 1. Sufficiency of the Evidence

Velasco Barrera contends that there was insufficient evidence to find him guilty of Counts 5 and 6: murder of Victim 1 and Victim 2 in aid of racketeering activity. We also address a similar challenge to Counts 7 and 8: kidnapping Victim 1 and Victim 2 resulting in their deaths, seemingly joined by all Appellants. After the close of evidence, Velasco Barrera moved for judgment of acquittal on the basis that the Government failed to produce sufficient evidence and improperly relied on unreliable witnesses. *See* Fed. R. Crim. P. 29(a).

We review *de novo* a district court's denial of a motion for acquittal. *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024). "A defendant challenging the sufficiency of the evidence bears a 'heavy burden' to overturn his conviction." *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024) (quoting *United States v. Clarke*, 843 F.3d 288, 297 (4th Cir. 2016)). This court must affirm the jury's verdict if, after drawing all reasonable inferences in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). We must refrain from making any credibility determinations. Rather, we "assume that the jury resolved all contradictions in testimony in favor of the [prosecution]." *Freitekh*, 114 F.4th at 308 (quoting *United States v. Penniegraft*, 641 F.3d 566, 572 (4th Cir. 2011)).

20

a. Counts 5 & 6: Murder in Aid of Racketeering Activity

In cases arising under VICAR, the prosecution must prove beyond a reasonable doubt that the defendant's "general purpose" in committing the alleged crime "was to maintain or increase his position in the enterprise." *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting *United States v. Conception*, 983 F.2d 369, 381 (2d Cir. 1992)). To establish that a defendant had the "requisite purpose," the prosecution must present evidence "from which 'the jury could reasonably infer that the defendant committed his violent crime because he knew it was expected of him by reason of membership in the enterprise or that he committed it in furtherance of that membership.'" *United States v. Zelaya*, 908 F.3d 920, 931 (4th Cir. 2018) (Floyd, J., concurring) (quoting *Fiel*, 35 F.3d at 1004). A defendant may still be convicted under VICAR "even if maintaining or increasing his position in a racketeering enterprise is not his 'only or primary concern' in carrying out a violent crime." *Id.* at 927 (quoting *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996)).

The Government presented ample evidence at trial showing that one of Velasco Barrera's motives in carrying out the murders was to be promoted within the MS-13 hierarchy. Indeed, he was promoted after each one.

Appellants contend that they had not been promised promotions for participating in the murders, and question the veracity of certain witnesses' testimony. Appellants point to the testimony of one witness who stated that none of the Appellants were promised a promotion for assaulting or murdering Victim 2. That same witness also testified, however, that MS-13 members are expected to commit violent acts, including murder, and—

depending on their rank—may even be required to participate in those murders. This testimony was confirmed by additional witnesses. Further evidence suggested Elmer Zelaya told certain MS-13 members that anyone who participated in the murders would receive a promotion. According to one witness, Elmer Zelaya told him "that some other people were going to be promoted to another rank . . . [b]ecause they had participated in the murder." 7 J.A. 2954.

Appellants urge us to reverse their convictions because the Government relied on the testimony of cooperating witnesses. Appellants maintain that cooperating witnesses are categorically unreliable because they are willing to say whatever is necessary to further their own self-interests. Appellants' argument would require us to evaluate the testimony of the Government's cooperating witnesses. Our role is not to assess the credibility of witnesses; indeed we are precluded from making credibility determinations. That is the constitutionally-enshrined province of the jury. The jury heard the witnesses' testimony, listened to their cross-examinations, and observed their demeanor and body language. As the district court noted: the jurors are "the sole and exclusive judges of the credibility of each of the witnesses called to testify." 12 J.A. 5360. We will not usurp their role.

Our standard of review requires us to view all evidence in favor of the Government, not against it. A rational jury could have found, beyond a reasonable doubt, that Velasco Barrera carried out the murders, at least in part, to increase his position in MS-13.

### b. Counts 7 & 8: Kidnapping Resulting in Death

Counts 7 and 8, kidnapping resulting in the death of Victim 1 and Victim 2, required the Government to prove that Appellants inveigled the victims. *See* 18 U.S.C. § 1201(a).

22

In this context, inveigling means "lur[ing] or entic[ing] through deceit or insincerity." *United States v. Walker*, 934 F.3d 375, 378 (4th Cir. 2019) (quoting *Inveigle*, Black's Law Dictionary (10th ed. 2014)). This court has explained that inveigling does not require the use of force or violence. *See id.* at 378–80.

A rational juror could find that Appellants inveigled Victim 1 and Victim 2. The evidence presented at trial was sufficient for a juror to find that gang members lured each victim to the park under the false pretense that a meeting would take place.

Appellants maintain that neither Victim 1 nor Victim 2 could have been inveigled because the victims were themselves affiliated, or indeed members, of MS-13. This assertion is without foundation. The VICAR statute contains no exception for gang members or affiliates who murder fellow members.

### 2. Severance of Defendants and Counts

Velasco Barrera also challenges the district court's refusal to sever the counts and each defendant's trial. He contends that the joinder of the counts was inappropriate because Victim 1 and Victim 2 were murdered on separate occasions. He also contends that joinder of defendants may have caused the jury to find him guilty by association and to use a codefendant's confession against him in contravention of *Bruton v. United States*, 391 U.S. 123 (1968). We affirm the district court's ruling that the counts and defendants were properly joined.

Federal Rules of Criminal Procedure 8 and 14 guide our analysis. We first review *de novo* whether the district court properly joined the offenses and defendants under Rules 8(a) and 8(b). *United States v. Young*, 989 F.3d 253, 265 (4th Cir. 2021); *United States v.*

23

*Mackins*, 315 F.3d 399, 412 (4th Cir. 2003). If the initial joinder was proper, we must then determine whether the district court abused its discretion under Federal Rule of Criminal Procedure 14 in denying the pre-trial motion to sever. *Young*, 989 F.3d at 265.

Rule 8(a) outlines the permissibility of joinder of offenses. It provides that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "[V]ery broad joinder" is permitted because of the increased efficiency in trying a defendant on related counts in one trial. *United States v. Mir*, 525 F.3d 351, 356 (4th Cir. 2008) (quoting *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005)). Joinder is the "rule rather than the exception." *Id.* (quoting *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995)). It avoids duplicative testimony and additional jury empanelment, promotes economical use of judicial resources, and minimizes the likelihood and inequity of inconsistent verdicts. *See id.*; *Zafiro v. United States*, 506 U.S. 534, 537 (1993).

Rule 8(b) governs the joinder of defendants. It establishes that an indictment may charge multiple defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro*, 506 U.S. at 537.

Rule 14 explains when a district court may sever trials. The district court may separate trials of counts, sever defendants' trials, or fashion relief that justice requires if

24

joinder appears to prejudice the defendants or the prosecution. Fed. R. Crim. P. 14(a). "Demonstrating prejudice is a high hurdle," because prejudice "exists 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Young*, 989 F.3d at 266 (quoting *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010)). To establish that the district court abused its discretion, a defendant must show that he was prejudiced by the denial of his motion to sever. *Lighty*, 616 F.3d at 348 ("[A] defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard.").

With these principles in mind, we begin by addressing the joinder of the charges. The joinder of the charges was appropriate. The offenses were committed close in time and followed the same pattern. *See United States v. Mouzone*, 687 F.3d 207, 219 (4th Cir. 2012). Appellants lured a "green lit" victim to a park at night where they attacked and killed him. 4 J.A. 1343. Appellants committed the charged crimes with the same purpose of furthering the "mission" of MS-13 and getting promoted in the gang. We therefore conclude that the initial joinder was proper. *See, e.g.*, *United States v. Blair*, 661 F.3d 755, 769 (4th Cir. 2011) ("In determining whether two offenses are connected with or constitute parts of a common scheme or plan for purposes of Rule 8(a), we have read the rule 'flexibly' to require simply a 'logical relationship' between offenses charged in the indictment.").

We also conclude that the district court did not abuse its discretion in denying the pre-trial motion to sever the counts. Velasco Barrera failed to show that joinder resulted in

25

prejudice. *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999). His conclusory assertion that the jury viewed all of the defendants as "associated in fact" cannot suffice to establish prejudice. The Government presented overwhelming evidence of Velasco Barrera's guilt and his role in the murders, and the district court properly instructed the jury that it must find each defendant guilty independently. We discern no abuse of discretion in the denial of the motion to sever.

We similarly hold that the district court properly joined the defendants' trials. Appellants were all charged with conspiracy to commit kidnapping and murder in aid of racketeering activity. Joinder is "highly favored" in conspiracy cases, and this case is no exception. *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012) (citation omitted) ("[W]hen an indictment properly has joined two or more defendants under the provisions of Rule 8(b), severance pursuant to Rule 14 is rarely granted.").

Velasco Barrera has not established that he was prejudiced by being tried together with his codefendants. It is the "exceptional case" where severance is granted on the basis of concerns about a "spillover effect" from one defendant's case to that of another. *United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019). A defendant is not entitled to severance "because the evidence against one defendant is not as strong as that against the other," or "because separate trials would more likely result in acquittal." *Akinkoye*, 185 F.3d at 197. "Rules 8(b) and 14 are designed 'to promote economy and efficiency and to avoid a multiplicity of trials,'" without violating the defendants' right to a fair trial. *Zafiro*, 506 U.S. at 540 (quoting *Bruton*, 391 U.S. at 131 n.6). Velasco Barrera's speculative and

26

conclusory allegations regarding possible prejudice do not satisfy his burden. *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002); *see also Zafiro*, 506 U.S. at 539–40.

Velasco Barrera also failed to establish that he was prejudiced by the admission of certain statements by his codefendants such that the jury would be prevented from making a reliable judgment about his guilt or innocence. In *Bruton v. United States*, the Supreme Court held that a defendant's right to cross-examination under the Confrontation Clause is violated when a facially incriminating extrajudicial statement by one codefendant is introduced against another codefendant. 391 U.S. at 126, 129–31. This is true even if the court instructs the jury to consider the confession only against a particular codefendant. *See id.* at 132–36. *Bruton* is a narrow rule: "If the statement of a non-testifying codefendant incriminates another only by virtue of linkage to other evidence at trial—that is, if it incriminates 'inferential[ly]' rather than 'facially'"—then *Bruton* is not implicated. *United States v. Benson*, 957 F.3d 218, 228 (4th Cir. 2020) (alteration in original) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208–09 (1987)). Yet Velasco Barrera concedes that the Government did not introduce any statements by a codefendant that facially implicated him. The district court also properly instructed the jury that it may only consider statements made by a defendant to law enforcement agents in deciding the charge against that specific defendant, and that it must decide each defendant's case according to his own acts, statements, conduct, and relevant evidence. *See Zafiro*, 506 U.S. at 539–41. The district court therefore did not abuse its discretion in denying Velasco Barrera's pre-trial motion to sever.

27

3. Admission of Witness's Handwritten Note

Velasco Barrera[13] contends that the district court abused its discretion in admitting a handwritten note from a cooperating witness under the "Present Sense Impression" exception to the hearsay rule. Fed. R. Evid. 803(1). The present sense impression exception provides that "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the prohibition against hearsay. Fed. R. Evid. 803(1). Past recollections recorded are also excepted from the rule against hearsay. Fed. R. Evid. 803(5). Under this exception, a "record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge," may be read into evidence, although it may be admitted as an exhibit if it is offered by an adverse party. Fed. R. Evid. 803(5).

The district court admitted as an exhibit a note written by a witness who had been incarcerated with Velasco Barrera and Ramirez Ferrera and spoke with them both. The witness memorialized his conversations with Velasco Barrera and Ramirez Ferrera in various handwritten notes. The witness wrote that Velasco Barrera told him that a weapon

---

[13] In their opening brief, the remaining Appellants also contend that they were prejudiced by the admission of the note due to a "spillover effect." The only individual directly incriminated by the witness's note was Velasco Barrera, and he filed a written opposition to its admission. Elmer Zelaya and Ramirez Ferrera challenged the admission of the note on other grounds that Appellants failed to raise in their opening brief. Accordingly, those claims were forfeited. *See, e.g.*, *United States v. Suncar*, 142 F.4th 259, 261 n.2 (4th Cir. 2025) (explaining that claims not raised in the opening brief are forfeited).

used during one of the murders had been buried and later thrown into the Potomac River to prevent it from being found.

The district court did not abuse its discretion by admitting the note about the disposal of the weapon under the present sense impression hearsay exception. The witness 1) was personally present for the conversation with Velasco Barrera; 2) provided a factual description of the conversation; and 3) memorialized the conversation as quickly as he could after he returned to his cell. These circumstances satisfy the requirements of the present sense impression hearsay exception. Fed. R. Evid. 803(1); *see United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir. 1982). Velasco Barrera contends that the district court should have considered the admissibility of the note instead under the past recollection recorded hearsay exception. Even if the note could be properly admitted under that exception, the district court did not abuse its discretion in admitting it under the present sense impression exception.

### 4. Imposition of Life Sentences

We turn next to Velasco Barrera's challenge to the district court's imposition of four mandatory life sentences without the possibility of parole as statutorily required for Counts 5 through 8: murder in aid of racketeering activity and kidnapping resulting in death. Velasco Barrera contends that, because he had only recently turned eighteen at the time of the offenses, the imposition of multiple life sentences violates the Eighth Amendment's

prohibition on cruel and unusual punishment. We review this constitutional question *de novo*. *See United States v. Cobler*, 748 F.3d 570, 575 (4th Cir. 2014).

Our governing precedents draw a bright line at the age of eighteen in the imposition of these serious penalties.[14] In *Roper v. Simmons*, the Supreme Court held that the imposition of the death penalty on minors violates the Eighth Amendment. 543 U.S. 551, 568 (2005). The Court thereafter expanded protections for children under eighteen. *E.g.*, *Graham v. Florida*, 560 U.S. 48, 70 (2010). In *Miller v. Alabama*, the Court held only that mandatory life without parole for those *under* age eighteen violates the Eighth Amendment, 567 U.S. 460, 489 (2012), though it said nothing about barring mandatory life without parole sentences for crimes committed by those who are legally adults. *E.g.*, *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018). Accordingly, the district court did not err in imposing mandatory life sentences without the possibility of parole on Velasco Barrera who had reached the legal age of majority.

---

[14] As an eighteen-year-old, Velasco Barrera was an "emerging adult." Emerging adulthood "refers to the transitional period" from approximately ages eighteen to twenty-five. Clare Ryan, *The Law of Emerging Adults*, 97 Wash. U. L. Rev. 1131, 1134 (2020). Neuroscience indicates that the brain continues to develop past age eighteen and into the twenties, affecting the ability of an individual to make decisions, assess risks, and regulate emotions. *See id.* at 1140. Indeed, the Supreme Court has recognized that the "qualities that distinguish [children] from adults do not disappear when an individual turns [eighteen]." *Roper v. Simmons*, 543 U.S. 551, 574 (2005).

30

### 5. Suppression of Evidence

Henry Zelaya appeals the district court's denial of his motions to suppress certain evidence at trial. We affirm the district court's ruling.

We review legal determinations *de novo* and underlying factual findings under the clear error standard. *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018). Because the district court denied Henry Zelaya's motions to suppress, we review the evidence in the light most favorable to the Government. *United States v. Hilton*, 701 F.3d 959, 964 (4th Cir. 2012).[15]

### a. Suppression of Evidence from the Arrest

We begin with Henry Zelaya's contention that the district court erred in denying his motion to suppress all evidence following his arrest.

At the core of the Fourth Amendment is the right of an individual to "retreat" into his home and "there be free from unreasonable governmental intrusion." *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). The curtilage, or the area "immediately surrounding and associated with the home," is considered part of the home for purposes of Fourth Amendment analysis. *Id.* (quoting

---

[15] Our inquiry as to the challenged search and seizure concerns whether Henry Zelaya's Fourth Amendment rights were violated. *See United States v. Castellanos*, 716 F.3d 828, 833 n.3 (4th Cir. 2013). This inquiry "requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* The Government assumed that Henry Zelaya had a legitimate expectation of privacy at his mother's home because there was testimony at the hearing indicating that he had stayed at his mother's home the day before he was arrested. *See United States v. Green*, 106 F.4th 368, 376 (4th Cir. 2024); *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

*Jardines*, 569 U.S. at 6). A warrantless search of an individual's home or curtilage is considered presumptively unreasonable. *See United States v. Cephas*, 254 F.3d 488, 494 (4th Cir. 2001).

The so-called "knock-and-talk" is an exception to the warrant requirement. *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192 (4th Cir. 2015). Under the knock-and-talk exception, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* (quoting *Jardines*, 569 U.S. at 8). This permits an officer "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 192–93 (quoting *Jardines*, 569 U.S. at 8). An officer may also "bypass the front door (or any other entry point usually used by visitors) when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property." *Id.* at 193.

Voluntary consent is another exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222 (1973). "The voluntariness of consent to search is a factual question, and as a reviewing court, we must affirm the determination of the district court unless its finding is clearly erroneous." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). We examine the totality of the circumstances, including the characteristics of the individual who supposedly consented—her age, maturity, intelligence, experience—and the conditions under which she gave consent—including the officer's conduct, the number of officers present, as well as the duration, timing, and location of the search. *Id.* Whether an individual knows of her right to refuse consent is a relevant factor, although

32

the prosecution need not "demonstrate that the [individual] knew of [her] right to refuse consent to prove that the consent was voluntary." *Id.*

When the district court bases a finding of voluntariness "on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the [district court] had the opportunity to observe the demeanor of the witnesses." *United States v. Wilson*, 895 F.2d 168, 172 (4th Cir. 1990) (citation omitted). We may not reverse the district court's determination that consent was voluntarily given "unless it can be said that the view of the evidence taken by the district court is implausible in light of the entire record." *Lattimore*, 87 F.3d at 651.

With this background in mind, we turn to the facts relevant to this challenge. A Special Weapons and Tactics (SWAT) team from the Federal Bureau of Investigation (FBI) conducted an "arrest operation" at a home in Woodbridge, Virginia, to apprehend Henry Zelaya pursuant to a federal arrest warrant. Henry Zelaya was not there, however. Law enforcement agents then proceeded to Alexandria, Virginia, to conduct a knock-and-talk at the home of Henry Zelaya's mother. She lived in an apartment on the ground floor of a garden-style complex. Her apartment had front and back entrances. The back entrance opened to a small concrete patio and yard, with access to the complex's parking lot. Law enforcement observed people entering and exiting the unit through the back entrance.

FBI Special Agent Carlos Fontanez knocked on the window in the back of the home. He was accompanied by several officers. Agent Fontanez introduced himself, and Henry Zelaya's mother permitted him and the other officers to enter her home. Once inside, Agent

33

Fontanez explained that the FBI had an arrest warrant for Henry Zelaya and that it would be ideal for him to surrender. Henry Zelaya's mother disclosed to Agent Fontanez that her son was in the back of the apartment. The agents subsequently arrested Henry Zelaya, who had his cellphone on his person. The FBI later obtained a search warrant and extracted data from the phone.

### i. Knock-and-Talk Exception

The district court did not clearly err in finding that the officers reasonably knocked on the back entrance to conduct the knock-and-talk, instead of the front door. *See, e.g.*, *Covey*, 777 F.3d at 193. Agent Fontanez observed people enter and leave Henry Zelaya's mother's home through the back entrance. Testimony from the evidentiary hearing indicated that the back entrance was "[v]ery accessible" from the sidewalk and parking lot. 2 J.A. 583. Another witness testified that there were no signs, fencing, walls, or other indicators that the back entrance was not to be used. We discern no clear error with the district court's findings that the officers reasonably approached Henry Zelaya's mother's back entrance and that no trespass occurred.

### ii. Voluntary Consent to the Search

Henry Zelaya also argues that any evidence from his arrest should have been suppressed because law enforcement agents coerced his mother into consenting to a search of her home. Upon review of the totality of the circumstances, the district court's conclusion that Henry Zelaya's mother voluntarily consented was not clearly erroneous.

Ample evidence in the record supports the finding that Henry Zelaya's mother consented to the search. Agent Fontanez testified that he introduced himself, showed his

34

credentials, and speaking in Spanish—Henry Zelaya's mother's native language—he explained that the FBI was looking for her son, and asked if the agents could come inside and speak to her. Although Henry Zelaya contends that the agents exceeded the scope of his mother's consent because only Agent Fontanez had been allowed to come inside, Agent Fontanez's testimony indicates otherwise. He testified that he asked Henry Zelaya's mother if they "could come inside and talk to her," and she "invited [them] inside," which supports a finding that she granted consent to the officers to enter. 2 J.A. 611. Once inside her home, Agent Fontanez spoke to her for several minutes before she divulged that Henry Zelaya was in the home.

Henry Zelaya's mother testified that she felt threatened by the presence of several agents surrounding her apartment and was pressured into giving up her son to protect her family. The district court concluded that Henry Zelaya's mother's testimony was not credible, however, finding her statements contradictory and inconsistent. Guided by our deferential standard of review and the district court's credibility determinations, we find no clear error.

### b. Suppression of Post-Arrest Statements

We turn next to Henry Zelaya's contention that the district court erred in denying his motion to suppress incriminating statements he made following his arrest because his waiver of rights, as announced in *Miranda v. Arizona*, was not made voluntarily, knowingly, or intelligently. 384 U.S. 436, 444 (1966).

The analysis of whether an individual waived his *Miranda* rights has two components. *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002). "First, the

35

relinquishment of the right[s] 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Second, 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 140 (quoting *Burbine*, 475 U.S. at 421). The court examines the totality of the circumstances surrounding the interrogation, including "the characteristics of the defendant, the setting of the interview, and the details of the interrogation" to determine the validity of a *Miranda* waiver. *Id.* Although we "must make an independent determination on the issue of voluntariness, the district court's findings of fact on the circumstances surrounding the confession are to be accepted unless clearly erroneous." *Id.*

The district court did not clearly err in determining that Henry Zelaya's waiver was knowing and intelligent. After reviewing the recording of the interrogation, the district court found that Agent Fontanez read through each *Miranda* right slowly in Henry Zelaya's native language, Spanish, as Henry Zelaya listened closely. Agent Fontanez repeatedly asked Henry Zelaya if he had questions about his rights and gave Henry Zelaya an opportunity to ask questions. Agent Fontanez provided ample time for Henry Zelaya to review and consider his waiver of *Miranda* rights.

We also conclude that Henry Zelaya's waiver was voluntary. Nothing in the record indicates that Henry Zelaya was intimidated, coerced, or deceived. To the contrary, the district court found that Agent Fontanez explained what was occurring using everyday language, asked Henry Zelaya to confirm his understanding of his rights, and waited for

36

his affirmative nod of comprehension. The district court's factual findings as to the circumstances of Henry Zelaya's interrogation were not clearly erroneous.

Henry Zelaya argues that Agent Fontanez's "rapport-building" before apprising him of his *Miranda* rights prevented him from making a free and deliberate choice to waive his rights by leading him to answer questions that exposed him to potential criminal liability. Prior to reading Henry Zelaya's *Miranda* rights, Agent Fontanez asked Henry Zelaya questions about his background, including where he was born and when and how he entered the United States. In response to these questions, Henry Zelaya shared information to Agent Fontanez about how he entered the United States without an immigration inspection, which is a federal offense.

This court has recognized an exception to *Miranda* for "routine booking questions securing 'biographical data necessary to complete booking or pretrial services,' although this exception does not apply to questions, even during booking, that are designed to elicit incriminatory admissions." *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (internal citations omitted) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion)). At least one other circuit has "held that, in certain circumstances, questioning regarding identity, address, or other routine background matters" may "provide incriminating evidence," and such questioning does not fall under the booking exception. *Id.* at 609 (citing *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993); *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046–47 (9th Cir. 1990); *United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986)). Although this court has yet to adopt this

37

limitation to the booking exception, Henry Zelaya's responses could have been incriminating. *Id.*

We need not decide whether Agent Fontanez erred in asking about Henry Zelaya's immigration status, or the reach of the booking exception, because we find any error harmless. *United States v. Elsheikh*, 103 F.4th 1006, 1014 (4th Cir. 2024). The district court did not permit the Government to introduce any of Henry Zelaya's statements relating to immigration. Moreover, Henry Zelaya did not challenge any trial testimony that was admitted as part of the pre-*Miranda* questioning and his immigration status had no bearing on the charges against him. *See id.*

### 6. *Rogers* Errors

Finally, Henry Zelaya and the Government agree that the district court made errors in imposing Henry Zelaya's sentence. *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020). In *Rogers*, this court recognized "that a material discrepancy between written and orally articulated discretionary conditions of supervision violates a criminal defendant's right to be present for sentencing." *United States v. Bullis*, 122 F.4th 107, 117 (4th Cir. 2024) (citing *Rogers*, 961 F.3d at 296).

It is undisputed that the district court's oral pronouncements and written judgment are inconsistent, with material differences. Unlike its oral pronouncement, the district court's written conditions required that Henry Zelaya partially pay the costs of a drug treatment program and prohibited him from using marijuana or cannabis. The district court also erred in referencing local rules promulgated by the United States District Court for the Eastern District of Virginia that did not exist at the time of sentencing. *See United States*

38

*v. Smith*, 117 F.4th 584, 605–07 (4th Cir. 2024). We therefore vacate Henry Zelaya's sentence and order resentencing.

## III. Conclusion

For the reasons set forth above, we affirm the convictions and sentences of Ronald Herrera Contreras, Pablo Miguel Velasco Barrera, Duglas Ramirez Ferrera, and Elmer Zelaya Martinez. As for Henry Zelaya Martinez, we affirm his conviction but vacate his sentence and remand for resentencing.

No. 22–4745 (Ronald Herrera Contreras) – *AFFIRMED*

No. 22-4746 (Pablo Velasco Barrera) – *AFFIRMED*

No. 23-4005 (Henry Zelaya Martinez) – *AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

No. 23-4006 (Duglas Ramirez Ferrera) – *AFFIRMED*

No. 23-4020 (Elmer Zelaya Martinez) – *AFFIRMED*

QUATTLEBAUM, Circuit Judge, concurring:

I join the majority opinion in full and write separately with respect to our decision to vacate and remand Henry Zelaya's sentence. *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), *United States v. Bullis*, 122 F.4th 107, 117 (4th Cir. 2024) and a number of other cases require this result. Even so, I write to reiterate my concerns about our circuit's jurisprudence in this area. *See United States v. Kemp*, 88 F. 4th 539, 547–53 (4th Cir. 2023) (Quattlebaum, J., concurring). Despite my concerns, however, I agree that the majority opinion properly applies our circuit's precedent.